THE QUARTZITE STONE COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 64668. Filed May 29, 1958.

*Willard N. Van Slyck, Jr., Esq.*, and *Murray F. Hardesty, Esq.*, for the petitioner.

*Marvin E. Hagen, Esq.*, for the respondent.

MULRONEY, *Judge:* The respondent determined deficiencies in income taxes of the corporate petitioner as follows:

| Year | Deficiency |
|------|-----------|
| 1951 | $20, 715. 76 |
| 1952 | 11, 438. 69 |
| 1953 | 3, 430. 08 |

The two issues presented for our determination are (1) whether the mineral deposit quarried by petitioner in the years before us is "quartzite" within the meaning of section 114 (b) (4) (A) (iii), thereby qualifying for percentage depletion at the rate of 15 per cent, and (2) whether certain payments made by petitioner under a "Machinery Lease Agreement" were, in fact, rental payments or partial payments on the purchase price of the machinery.

Several adjustments made by respondent are uncontested and will be considered on a Rule 50 computation.

### FINDINGS OF FACT.

Some of the facts were stipulated and are found accordingly.

Petitioner is a Kansas corporation that has operated since 1931 under the corporate name of Quartzite Stone Company with its principal place of business near the city of Lincoln, Kansas. During the taxable years involved herein, petitioner maintained accrual books and records and filed its Federal income tax returns on a calendar year basis. The Federal income tax returns for the years before us were timely filed by petitioner with the then collector of internal revenue for 1951 and the district director of internal revenue for 1952 and 1953, both of the district of Kansas, Wichita, Kansas.

During the taxable years petitioner was lessee of two tracts of realty in Lincoln County, Nebraska, containing certain natural mineral deposits. The petitioner was engaged throughout the taxable years in the business of quarrying, crushing, and selling these mineral

deposits. The appearance, physical properties, and chemical composition of petitioner's deposits were at all times substantially uniform throughout the quarries.

In general, the deposits were quarried by removing the overburden and blasting the rock with dynamite. The rock was then hauled to a primary crusher where it was reduced to various sizes and then was passed through a secondary crusher where it was further reduced in size. The rock was then screened to appropriate sizes and was placed in bins to await shipment.

All of the deposits which petitioner removed from its quarries and sold during the taxable years were sold to purchasers for uses as railroad ballast, concrete aggregate, highway surfacing, filter rock, and riprap. None of petitioner's deposits were sold as refractory materials.

Petitioner's deposits are sedimentary in nature and contain approximately 60 to 65 per cent silicon dioxide; 20 to 30 per cent calcium carbonate; 0.03 to 1.84 per cent aluminum oxide and 0.0 to 1.5 per cent iron oxide. The cement in petitioner's rock is calcite. Quartzite used for refractory purposes must contain, among other things, a minimum of approximately 95 per cent silicon in order to withstand the extreme temperatures and is a metamorphosed or silica-cemented sandstone.

Quartzite has many commercial uses other than for refractory purposes for which such a high percentage of silicon is not necessary. Such users who have employed petitioner's product for many years consider the product quartzite within the common meaning of the term as applied to their usage.

Shortly before December 1, 1951, petitioner placed an order with the Salina Tractor Company, Inc., hereinafter referred to as Salina, for a new model HD–15 tractor equipped with dozer. Salina was unable to make immediate delivery of the equipment. On December 1, 1951, petitioner entered into an agreement with Salina entitled "Machinery Lease Agreement" for the acquisition of a used model TD–18 tractor with dozer, which agreement provided, among other things, that the "agreed total rental of Ten Thousand Seven Hundred Fifty Dollars ($10,750.00)" was to be paid monthly at the rate of $895 per month, commencing December 1, 1951. It was also provided that each payment would "include interest at 6% on the unpaid balance of the lease."

The conditions provided for in the agreement were as follows:

CONDITIONS: Lessee agrees that he will take reasonable and proper care of said equipment and at his own cost and expense will make all necessary repairs and replacements and that he will not sublet the equipment without the written consent of the Lessor; also that if any portion of said rental shall not be paid as herein specified, or if any of the provisions of the lease be violated, rental for the full term shall become due and payable forthwith, and the

Lessor may at his option take possession of and remove said equipment without legal process. The Lessee agrees to procure at his own expense fire insurance adequately covering said equipment, payable in case of loss to Lessor, and to pay all taxes, assessments, or other public charges to which the equipment may be subjected.

The Lessee shall, upon termination of the lease, return the equipment to the Lessor complete and in good condition, reasonable wear and tear only accepted, [sic] by delivering prepaid the equipment to 527 North Ninth Street, Salina, Kansas, [sic] Lessor may assign this lease.

PURCHASE OPTION No. I: If the Lessee shall keep all the terms of this agreement Lessee shall have the right to purchase the equipment upon the expiration of this lease upon paying to Lessor the sum of $1.00 together with all sums which Lessee may owe Lessor at that time for parts and supplies furnished.

PURCHASE OPTION No. II: If the Lessee shall keep all the terms of this Agreement and desires to purchase one or more new crawler tractors and dozers from Lessor before the termination of this agreement the Lessee may return the equipment at any time and receive a credit on the new purchase amounting to 20% of rental monies paid to Lessor under this agreement.

In June of 1952 Salina delivered to petitioner the new model HD–15 tractor which had been previously ordered. At this time petitioner's president decided it had such a large investment in the used equipment, amounting to $4,654, that it could not afford to fail to exercise the options to acquire the equipment by paying the balance of the monthly payments plus the sum of $1.

Petitioner's used tractor was out of commission, being repaired, for a total of about 4 weeks in 1952 and Salina paid for most of the repairs for the reason that it had represented that the used tractor was in good operating condition and it was company policy to make such representations good.

During the period the machinery lease agreement was in effect, petitioner paid for fire insurance and taxes on the used tractor. Except for the period when the tractor was out of commission, petitioner used the tractor for cleanup work and for moving railroad cars. The used tractor had been used by a contractor for approximately 5 years before petitioner acquired it and petitioner used it from December 1, 1951, to sometime in 1957 when it was traded for other equipment.

The normal estimated useful life of a model TD–18 tractor such as petitioner acquired from Salina is 5 to 30 years, depending upon the use and care to which it was put.

The respondent disallowed deductions of $895 and $3,759 in 1951 and 1952, respectively, which were taken by petitioner as rental expenses for the used tractor. The sums paid by petitioner for the model TD–18 tractor with dozer were, in fact, payments on the purchase price of the equipment and petitioner was, in effect, acquiring an equity interest in the equipment. Therefore, the sums paid by petitioner are not deductible as rental expense.

OPINION.

The principal issue before us is whether or not the mineral deposit quarried by petitioner in the years before us is "quartzite," thereby qualifying for percentage depletion at the rate of 15 per cent under section 114 (b) (4) (A) (iii), I. R. C. 1939. The said statute provides, in part:

SEC. 114. BASIS FOR DEPRECIATION AND DEPLETION.

(b) BASIS FOR DEPLETION.—

\*       \*       \*       \*       \*       \*       \*

(4) PERCENTAGE DEPLETION FOR COAL AND METAL MINES AND FOR CERTAIN OTHER MINES AND NATURAL MINERAL DEPOSITS.—

(A) In General.—The allowance for depletion under section 23 (m) in the case of the following mines and other natural deposits shall be—

\*       \*       \*       \*       \*       \*       \*

(iii) in the case of metal mines, aplite, bauxite, fluorspar, flake graphite, vermiculite, beryl, garnet, feldspar, mica, talc (including pyrophyllite), lepidolite, spodumene, barite, ball clay, sagger clay, china clay, phosphate rock, rock asphalt, trona, bentonite, gilsonite, thenardite, borax, fuller's earth, tripoli, refractory and fire clay, quartzite, diatomaceous earth, metallurgical grade limestone, chemical grade limestone, and potash, 15 per centum, \* \* \*

The respondent contends that the deposit is not quartzite; that it is calcareous sandstone and thereby falls within the classification of "stone" under section 114 (b) (4) (A) (i), which provides for a percentage depletion of 5 per cent.

It is agreed by both parties that the theory under which we must determine whether or not petitioner's rock is quartzite within the intent of Congress, is by applying the commonly understood commercial meaning of the term. This theory or test has been approved by this and other courts numerous times. See *Virginian Limestone Corporation*, 26 T. C. 553; *Spencer Quarries, Inc.*, 27 T. C. 392; and *South Jersey Sand Co.*, 30 T. C. 360. See also S. Rept. No. 781, 82d Cong., 1st Sess., p. 38.

The question in *South Jersey Sand Co., supra*, was whether the product mined by the taxpayer was sand or quartzite. Sand is also given a depletion rate of 5 per cent under section 114 (b) (4) (A) (i). We pointed out in the cited case that the taxpayer was arguing "its sand is 'quartzite' within the meaning of section 114 (b) (4) (A) (iii)." But we held "these words [sand and quartzite] were used by Congress so as to be mutually exclusive, and we are therefore not faced with the choice of selecting one out of two categories, both of which are applicable to the substance in question."

Here we are faced with the problem, not present in the *South Jersey Sand Co.* case, for it must be admitted the substance "quartzite" would qualify as "stone." The two substances are not mutually ex-

clusive. If petitioner's product falls within the commonly understood commercial meaning of "quartzite" mentioned specifically in the statute, it would be appropriate to apply the 15 per cent rate of depletion for quartzite rather than the 5 per cent rate of depletion applicable to the more general term "stone."

Although respondent concedes that the end-use theory is not to be applied in this case, he applies a theory much like it in his definition of quartzite. Prior to the respondent's acquiescence in *Spencer Quarries, Inc., supra,* the respondent's position was that only quartzite which was sold for use as a refractory material qualified for depletion at the rate of 15 per cent under section 114 (b) (4) (A) (iii). This theory was abandoned and in Revenue Ruling 57–584, 1957–2 C. B. 898,[1] the respondent attempts to define quartzite.

As can be seen by a reading of the cited ruling in the footnote, it is first stated that quartzite was defined in *Spencer Quarries, Inc., supra,* as having, among other things, a "free silicon dioxide content in excess of 95 percent." Using the "definition" in *Spencer Quarries, Inc., supra,* the respondent concluded that quartzite had to have "definite chemical and physical characteristics (*including capacity for use as a refractory*)" which means at least 95 per cent silicon, to qualify as "quartzite." (Emphasis supplied.)

The only difference between the two positions of respondent is that in the former he would admit that a mineral was quartzite but deny the 15 per cent depletion allowed under section 114 (b) (4) (A) (iii) on the ground that the end-use of part of the mineral quarried was not *to be used* as refractory materials. Under the latter position respondent merely denies that the mineral is quartzite unless it is of sufficient purity so that it *could be used* as a refractory material.

There really is no definition of quartzite in *Spencer Quarries, Inc., supra.* There respondent admitted the mineral mined was quartzite and the quoted portion of this case, taken by the respondent as a

---

[1] In the *Spencer Quarries* case the court found that all of the natural deposits removed from the quarry and sold during the year were identified and classified according to their mineralogical, petrological, geological, and chemical content, as "quartzite". These deposits were defined in the language of the court as "mineral deposits of metamorphosed or silica-cemented sandstone having a free silicon dioxide content in excess of 95 percent; are so firmly cemented that they have the physical characteristic of breaking across rather than around the original sand grains; have a low porosity, and are very resistant to high temperatures, sudden changes in temperature, and most chemical reagents."

Therefore, for purposes of determining the depletion rate under the 1939 Code, the use or non-use as a refractory and the use or non-use as a stone is immaterial as long as the mineral in question has the definite chemical and physical characteristics (*including capacity for use as a refractory*) which enable it to meet the foregoing definition of quartzite.

Accordingly, the term "quartzite" for purposes of section 114 (b) (4) (A) (iii) of the 1939 Code (as amended by section 319 of the Revenue Act of 1951) and section 39.23 (m)–5 (a) of Regulations 118, is defined as a mineral deposit of metamorphosed or silica-cemented sandstone having a free silicon dioxide content in excess of 95 percent; being so firmly cemented that it has the characteristic of breaking across rather than around the original sand grains; having a low porosity; and being very resistant to high temperatures, sudden changes in temperature and most chemical reagents. [Emphasis supplied.]

definition, is found in the Findings of Fact in *Spencer* and obviously was not intended to be a definition of quartzite but a statement of the characteristics of the mineral in that case. Since the quest is for the commonly understood commercial meaning of the term "quartzite" it is of interest to point out that the same findings of fact in *Spencer* pointed out that taxpayer's sales for refractory purposes did not form a large part of taxpayer's business; the majority of its sales being to the construction industry for use as crushed stone, crushed rock, riprap, the construction of highways, earth dams, and as concrete aggregate.

The *Spencer* case, *supra*, is not authority for the proposition that the term "quartzite" is limited to mineral of sufficient purity so that it could be used as a refractory material. No such limitation on the term quartzite is found in the Code or in the legislative history of the statute. Section 114 (b) (4) (A) (iii) provides for percentage depletion at the rate of 15 per centum in the case of many mineral deposits including "refractory and fire clay, quartzite, * * * metallurgical grade limestone, chemical grade limestone." As can be seen, the Congress saw fit to specify certain grades of some minerals according to their purity or according to the use to which they were to be put. It is noted that the Congress did employ the word "refractory" to limit clay, which is found just in front of quartzite in the statute. Certainly, had Congress intended to limit quartzite to that mineral of such purity that it could be used as a refractory material, it would have listed the mineral as "refractory quartzite." See *United States Gypsum Company* v. *United States*, 253 F. 2d 738 (C. A. 7). Since Congress did not see fit to place any restrictions on the term "quartzite," it is necessary for us to determine only whether or not petitioner's deposits are quartzite within the commonly understood commercial meaning of the term.

In making this determination, it is necessary to discuss the commercial uses of the deposits. A very small percentage of quartzite quarried is used for refractory material. The needs of the construction industry for quartzite in the form of riprap, railroad ballast, concrete aggregate, etc., far exceed the general needs for refractory materials. *Spencer Quarries, Inc., supra.* Consequently, the construction industry uses much more quartzite than the refractory industry. As we have found, petitioner's only sales were to the construction industry.

Because the commercial meaning of the term quartzite varies with the industry, it is difficult to arrive at a commonly understood commercial meaning of the term. Some users require very high standards and others require lower standards. As we have said, our only concern with standards is whether or not the product is quartzite. It

is agreed that the refractory industry requires very high standards of purity in its quartzite while the construction industry requires lower standards because of the uses to which the material is put.

Petitioner's product does not measure up to the requirements of the refractory trade but adequately fills the needs of the construction industry. Petitioner's corporate name, The Quartzite Stone Company, used for more than 20 years before the taxable years involved, is some indication that its product was represented as quartzite and 20 years of sales indicates some acceptance by the commercial world of that product as quartzite. The construction industry dealing with petitioner considered petitioner's product to be quartzite. Petitioner advertised the product as quartzite and orders were placed and filled by petitioner specifically requiring quartzite of certain specifications. The State Geological Survey Bulletin of Kansas also referred to petitioner's deposits as quartzite. Certainly in the construction industry, petitioner's product was quartzite within the commercial meaning of the term.

There is some dispute among geologists as to petitioner's mineral deposits. It is admitted by petitioner that its deposits do not come up to the requirements of the "classic" definition of quartzite. All of the expert witnesses testified that according to the "classic" definition, quartzite is a metamorphic, silica-cemented sandstone which, when fractured, because of the hardness of the cementing material, will break through the grains as easily as through the cement. As we have stated, petitioner's deposits are sedimentary, calcite-cemented sandstone, which, when fractured, for the most part, breaks through the grain as well as through the cementing material. Petitioner's witness, who tested the deposits, testified that while the fractured sample sometimes broke around the grain, the cementing material was of sufficient hardness that, of the grains counted, 62 per cent were fractured.

According to one of petitioner's witnesses, Ada Swineford, an eminently qualified geologist and sedimentary petrographer for the State Geological Survey of Kansas, petitioner's deposits qualify as quartzite. She ran laboratory tests on the deposits and determined that even though the deposits are sedimentary and were cemented by calcite, the deposits are quartzite. She did admit that the theory under which she determined the deposits were quartzite was relatively new among sedimentary petrographers but was recognized by some of the leading men in the field, even though the deposits were not quartzite according to the "classic" definition of the term.

Our concern is not with the classic definition or scientific theories concerning the term quartzite but deals with the commonly understood commercially acceptable meaning of the term. We hold, under all of

the evidence presented, that petitioner's deposits are quartzite within such meaning and, therefore, within the meaning of section 114 (b) (4) (A) (iii).

The second issue deals with certain deductions taken by the petitioner in 1951 and 1952 as rental payments for certain machinery under section 23 (a) (1) (A). The respondent determined that such payments were not in fact rental payments but partial payments on the purchase price of the machinery and disallowed the deductions.

Petitioner, in December of 1951, entered into a machinery lease agreement with Salina for the acquisition of a used tractor with dozer. The agreement provided for total "rental" of $10,750 to be paid at the rate of $895 per month, each payment to include interest at 6 per cent of the unpaid balance of the "lease." After providing that the petitioner would pay for all necessary repairs, taxes, and insurance, the petitioner was given an option to purchase the equipment at the expiration of the agreement upon paying Salina the sum of $1 together with any amount the lessee owed Salina for parts and supplies. A second option was provided for whereby the petitioner could purchase one or more new crawler tractors and dozers from Salina and apply 20 per cent of the "rental" moneys already paid to Salina by returning the used tractor with dozer. In June of 1952, or some 6 months after entering the agreement, petitioner decided to exercise the purchase option and keep the used tractor by paying the balance of the monthly payments due on the tractor and also the $1 option price.

It is well settled that regardless of the form or nomenclature of the transaction, so-called "rental payments" must be treated as partial payments of the purchase price of property, if by virtue of the payments the taxpayer has acquired, or will acquire, title to or an equity in, the property. *Chicago Stoker Corporation*, 14 T. C. 441; *D. M. Haggard*, 24 T. C. 1124, affd. 241 F. 2d 288; and *Ersel H. Beus*, 28 T. C. 1133. In fact, section 23 (a) (1) (A) of the Code itself restricts "rental" payments in much the same language in that it allows as deductions all of the "ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including * * * rentals or other payments required to be made as a condition to the continued use or possession, * * * of property to which the taxpayer has not taken or is not taking title or in which he has no equity."

It is obvious to us that petitioner was acquiring, through the payment of $895 per month, something more than the mere use of the equipment in question. An almost conclusive indication of this is the fact that a year after petitioner agreed to pay $10,750 for a year's "rental" it was to be permitted to "purchase" the tractor for the extremely nominal sum of $1. The "rental" charge is so disproportionate to the "purchase" price that we think it is unnecessary to dis-

cuss the issue further. See *D. M. Haggard*, *supra*, and *Truman Bowen*, 12 T. C. 446. In the light of the foregoing, and after considering the entire record, we are convinced that the petitioner was acquiring a substantial equity through the payments designated as rent. Accordingly, we hold that such payments are not deductible under section 23 (a) (1) (A).

*Decision will be entered under Rule 50.*