**BLUE RIDGE STONE CORPORATION,**
Plaintiff,

v.

**UNITED STATES of America,**
Defendant.

**Civ. A. No. 848.**

United States District Court
W. D. Virginia,
Roanoke Division.

Feb. 5, 1959.

Joseph Wyson Smith of Hazelgrove, Shackelford & Carr, Roanoke, Va., for plaintiff.

Peter J. Donahue, Lyle M. Twiner, James P. Garland, Attys., Dept. of Justice and Charles K. Rice, Asst. Atty. Gen., John Strickler, U. S. Atty., Roanoke, Va., on brief, for defendant.

THOMPSON, Chief Judge.

This action was tried to the Court without a jury; it was brought by the plaintiff, the Blue Ridge Stone Corporation, which is engaged in the business of quarrying and selling rock, against the United States as defendant, for the refund of taxes allegedly improperly assessed and collected by the defendant from the plaintiff for the fiscal years ending March 31, 1952, 1953, and 1954. The plaintiff contends that the product it quarries is "dolomite" rather than "stone" as it was classified by the defendant, and that the depletion allowance it received was therefore less than that to which it was entitled.

The Court finds the facts as specifically set forth herein and hereafter states its conclusions of law thereon.

### Findings of Fact.

The plaintiff corporation has operated a quarry in the Roanoke, Virginia area near the Bedford-Botetourt County line since 1917 under a lease from the Virginia Iron, Coal & Coke Co. During the taxable years here involved, the plaintiff operated on a fiscal year basis, such year ending on March 31, and filed its Federal income tax return accordingly. The claims for refund of the amounts here in question were timely filed with the Internal Revenue Service. Throughout the entire period here in question, the plaintiff was engaged in the business of quarrying, crushing, and selling rock. The appearance, physical properties, and chemical composition of the plaintiff's deposits were substantially uniform throughout the quarry.

The method of quarrying the deposit was to remove the overburden, drill into the exposed face of the deposit and place charges of dynamite in the holes drilled, then blast the material down to the quarry floor. After it was blasted, the deposit was hauled by plaintiff to its crusher where it was broken into various sizes according to the specifications of the plaintiff's customers. In the breaking and crushing process, nothing was added to the plaintiff's product and nothing was taken away. The plaintiff's product was used primarily for highway construction, railroad ballast, and concrete aggregate. None of it was ever used as a blast furnace flux or refractory, nor was it ever used as a source of magnesium metal.

The natural deposit contained in the plaintiff's quarry is officially classified as "dolomite" in numerous official publications, including the following:

(1) "Industrial Limestones and Dolomites in Virginia: New River-Roanoke River District," by Byron N. Cooper; Bulletin 62 (1944), Virginia Geological Survey, approved by Virginia Conservation Commission.

(2) Outline of Mineral Resources in Virginia, Plate 9, Bulletin 47, Virginia Geological Survey.

(3) Geological Map of the Appalachian Valley of Virginia prepared by Dr. Charles Butts, Senior Geologist, United States Geological Survey, edited by Dr. G. W. Stose, Geologic Map Editor, U. S. Geologic Survey.

(4) The Virginia Minerals Directory of Rock and Mineral Products. July 1958, pub. by Virginia Conservation Commission.

The authoritative nature of such publications has been recognized by the Tax Court of the United States. Virginian Limestone Corp. v. Com'r, 1956, 26 T.C. 553, at page 558–559, Footnote 3.

Bulletin No. 62, Virginia Geological Survey (approved by Virginia Conservation Commission) p. 65, reads as follows:

"The Blue Ridge Stone Corporation's quarry, near the Bedford-Botetourt County line, affords the only extensive exposure of the Elbrook dolomite in the vicinity of Roanoke. The rock is mainly a dark-gray, very fine-grained, compact dolomite similar to the dolomite member of the Rome formation. Several light-gray and buff beds are shown in the northern end of the quarry."

and further at p. 67

"Near the Blue Ridge, the mantle rock increases in thickness and obscures the position of the Blue

Ridge fault. In the absence of good exposures, the breadth of the outcrop and northern limits of the beds quarried at locality 84 (the Blue Ridge quarry) can be ascertained only by core drilling. A large body of dolomite probably identical in character to that now being quarried occurs in the low ridge between U. S. Route 460 and the railroad in the vicinity of Blue Ridge Station." (Parenthetical insert added.)

The Geological Map of the Appalachian Valley of Virginia, prepared by the U. S. Geological Survey, also designated the plaintiff's quarry as being located in the massive dolomite deposit known as the Elbrook Dolomite. The plaintiff is listed as a producer of dolomite in the July, 1958 edition of the Virginia Minerals Directory. All of the rock quarried by the plaintiff during the period here involved was taken from the deposit known as the "Elbrook dolomite formation," also referred to as the "Elbrook Limestone Formation."

The term "dolomite," when used to refer to rock, is one of specific designation and has reference to a particular class of sedimentary rock commonly known by that name which is rich in magnesium carbonate. The magnesium carbonate content of numerous random samples of the deposit in the plaintiff's quarry ranged from 19+% to 32%. An eminently qualified geologist, Dr. Byron N. Cooper, made numerous tests on these samples of plaintiff's product, and on the basis of the results of these tests, was of the opinion that the plaintiff's product is dolomite [1] within the commonly understood commercial meaning of the term.

During the period here involved, the plaintiff's product was classified by the defendant as "stone," thereby allowing plaintiff only a 5% depletion; however, in the trial of the case, it was contended by the defendant that the plaintiff's product was actually marble, and thus entitled to only a 5% depletion allowance; most of the defendant's evidence was directed toward that contention. It was also contended by the defendant that if the plaintiff's product was not marble, it must be stone.

"Stone" is a term of general classification, and may refer to any kind of rock at all, including dolomite rock. Marble, on the other hand, is a specific term of narrow meaning. One of the characteristics of marble is that it is capable of being polished, but it does not necessarily follow that all rocks which can be polished are marble. The plaintiff's product is not capable of being cut into dimension stone, and it is unsuitable for use as terrazzo. It is not, and has never been, recognized in the trade as a marble, and it does not fall within the commonly understood commercial meaning of that term. Although the plaintiff's product can be polished, it is not a marble.

### Conclusions of Law.

This Court has jurisdiction of the subject matter and of the parties to this action pursuant to Title 28 United States Code § 1346(a)(1).

The issue to be decided is whether or not the plaintiff's deposit is "dolomite," thereby qualifying for percentage depletion at the rate of 10% under Sec. 114(b)(4)(A)(ii), I.R.C.1939, as amended, 26 U.S.C. § 114(b)(4)(A)(ii). This statute provides in part:

"§ 114(b)(4)(A) * * * The allowance for depletion under section 23(m) in the case of the following mines and other natural deposit shall be * * *

"(ii) in the case of * * * dolomite, * * * 10 per centum, * * * * * *

of the gross income from the property during the taxable year * *."

The term dolomite is not defined in the statute. Originally, the practice of the Internal Revenue Service was to determine the nature of the product of a

[1]. In Dr. Cooper's opinion, a rock which is more than 50% composed of the mineral dolomite is commonly known in the trade as dolomite.

quarry by looking to its "end use;" however, this test has been completely repudiated as a means of determining the nature of a product and hence the depletion allowance available to its producers; Virginian Limestone Corp. v. Com'r, 1956, 26 T.C. 553; Spencer Quarries, Inc. v. Com'r, 1956, 27 T.C. 392; Quartzite Stone Co. v. Com'r, 1958, 30 T.C. 511. The Revenue Ruling 57–288, 1957–1, Cum.Bull. 518, is certainly not applicable, under the facts of this case.

Even were the end-use test here applicable, the defendant would be hoist by its own petard, for that test would not establish either that the plaintiff's product is marble, or that it is stone. The plaintiff's product is used mainly as concrete aggregate, railroad ballast, and riprap, for all of which uses dolomite is well suited and for which purposes it is sometimes preferable to stone. None of the plaintiff's product has ever been cut into dimension stone or used as terrazzo, nor has it ever been used for any of the purposes for which marble is suited.

The test approved by Congress and the cases cited was whether or not the plaintiff's products met the commonly understood commercial meaning of the substance in respect to which the depletion was granted.

The statute does not define "dolomite" or any of the other minerals mentioned therein; but the meaning which Congress intended to attach to them is shown by the legislative history. Such history may be resorted to as an aid to construction, when the meaning of the words of a statute are doubtful. Penn Mutual Life Insurance Co. v. Lederer, 252 U.S. 523, 40 S.Ct. 397, 64 L.Ed. 698. The Senate Finance Committee, which added the provisions now contained in paragraph (i), (ii), and (iii) of section 114(b)(4)(A), stated in its report: "The names of all the various enumerated minerals are of course intended to have their commonly understood commercial meaning." Virginian Limestone, supra, 26 T.C. at page 559.

It is agreed by both parties that the theory under which we must determine whether or not petitioner's rock is quartzite within the intent of Congress, is by applying the commonly understood commercial meaning of the term. This theory or test has been approved by this and other courts numerous times. See Virginian Limestone Corporation, 26 T.C. 553; Spencer Quarries, Inc., 27 T.C. 392; and South Jersey Sand Co., 1958, 30 T.C. 360. See also S.Rept. No. 781, 82nd Cong., 1st Sess., p. 38. Quartzite Stone Co., supra, 30 T.C. at page 514.

There are certain uses of dolomite for which only dolomite of a particular degree of purity can qualify. Such would be use as a refractory, as a dead-burn flux, and as a source of magnesium. It is, however, a fact that only a small per cent of all the dolomite quarried is used for these purposes, while most of it is used in the construction industry as riprap, ballast, or concrete aggregate. In writing the statute providing for the depletion allowance, Congress did not see fit to limit the term dolomite to dolomite of any particular degree of purity. Virginian Limestone, supra, is not authority for the premise that *only* dolomite of the chemical composition there involved is entitled to the per cent depletion allowance for dolomite. While that decision establishes that a rock with a magnesium carbonate content greater than 35% is "dolomite" within the meaning of the statute, it does not decide that a rock with less than 35% magnesium carbonate content may not be dolomite.

■ The determination to be made with respect to any particular deposit depends on whether or not that particular deposit fits into the commonly understood commercial meaning of the term denoting the substance in respect of which percentage depletion has been allowed.

■ As found in the facts above, stone is a term of general classification. Dolomite is a more specific term. Although all dolomite may be stone, not

all stone is dolomite. The congressional intent was that the depletion allowance provided for a specific mineral named should govern rather than the depletion allowance specified for a more general classification which might include that specific mineral. See Conference Report; H.Rept. 1213, 82d Cong., 1st Sess., p. 77. See Virginian Limestone, supra. Therefore, although plaintiff's product may fall within the commonly understood commercial meaning of the broad term stone, as well as within the more restrictive term dolomite, the latter is the more specific term, and the plaintiff is thus entitled to the depletion allowance provided for dolomite if its product falls within the commonly understood commercial meaning of that term. The plaintiff's product does not measure up to the high standard of purity required for use as a refractory. However, the term "dolomite" has come to have the same commonly accepted meaning in commerce and in industry as it has among geologists, Virginian Limestone, supra, 26 T.C. at page 558, Footnote 3, and therefore the issue here is whether the plaintiff's product falls within that commonly accepted meaning of the term.

The deposit in the plaintiff's quarry has been designated as dolomite by numerous official publications of wide circulation in the commercial world, including the map prepared by the United States Geologic Survey and the official bulletins enumerated in the Findings of Fact, and is classified as dolomite by Dr. Byron N. Cooper, one who is an eminently qualified expert on the subject.

The defendant's only witness was Joseph Berman, B. A., M. A., an experienced geologist who is employed by the Engineering and Valuation Section of the Internal Revenue Service. Mr. Berman does not recognize any rock as dolomite unless it contains at least 90% of the mineral dolomite and is suitable for use as a refractory, a flux, or a source of magnesium. Notwithstanding the congressional intent that the word "dolomite" is to have its commonly understood commercial meaning, Mr. Berman feels that such a classification is too loose, and that the Tax Court erred in its holding in Virginian Limestone, supra. In view of the fact that Mr. Berman's views are in conflict both with the holdings of the Tax Court and with the stated congressional intent, his testimony cannot be considered as decisive in this case.

This court is not concerned with classic definition or recondite scientific theories concerning the term "dolomite." See Quartzite Stone Co., supra, 30 T.C. at page 518. The plaintiff's product falls within the commonly understood commercial meaning of the term "dolomite;" the plaintiff is therefore entitled the depletion allowance accorded to producers of dolomite by the statute, and upon an accurate calculation of the refund to which the plaintiff is entitled, judgment will be entered accordingly.