ARTHUR E. REICH AND CAROLYN G. REICH, ET AL.,[1] PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 2065–65—2069–65, 2088–65—2091–65, 3152–65, 3353–65, 3214–66, 3818–66. Filed July 31, 1969.

*Mark Townsend* and *John D. Clark, Jr.*, for the petitioners.
*J. Earl Gardner* and *Richard W. Janes*, for the respondent.

---

[1] Proceedings of the following petitioners are consolidated herewith: Arthur E. Reich, docket No. 2066–65; Carolyn G. Reich, docket No. 2067–65; Allen Smith White and Phyllis D White, docket No. 2068–65; Virgil H. Koch and Florence V. Koch, docket No. 2069–65; Roy Parodi and Marcella Parodi, docket No. 2088–65; William O. Anderson and Glenna V. Anderson, docket No. 2089–65; J. Irving Anderson and Grace H. Anderson, docket No. 2090–65; Russell T. Burnham and Doris H. Burnham, docket No. 2091–65; James H. Walraven and Frances A. Walraven, docket No. 3152–65; Fred B. Smales and Florence E. Smales, docket No. 3353–65; Thermal Power Co., docket No. 3214–66; and Fred B. Smales and Florence E. Smales, docket No. 3818–66.

708

## OPINION

The first issue is whether Thermal is entitled, pursuant to section 613,[5] to deduct percentage depletion at the rate of 27½ percent against gross income received from geothermal steam wells at The Geysers. To resolve the issue, we must first decide three factual questions.

The first question is whether the commercial product of the wells at The Geysers is steam or heat. Respondent's position—which he characterizes as his primary stance in the case—is that the commercial product of the wells is the internal heat of the earth. It follows, respondent contends, that the product of the wells is not depletable because the earth's heat is inexhaustible.

In order to establish his position that the product of the wells is heat, respondent constructs an elaborate argument. He begins with the premise that steam is nothing more than a combination of heat and water. He then points out that at The Geyser's electrical generating plants the water in the steam is discarded after the steam is used to turn the turbines. He concludes that of the two elements in steam, only the heat is commercially useful because the water is thrown away. Thus, he says, the water serves only as a conductor to carry the earth heat to the turbines.

We do not agree. Were it not for the seriousness with which respondent urges his argument, we would think he is resorting to a mere play on words. For purposes of the commercial enterprise at The Geysers, steam is much more than heat and water. It is heat and water combined in a way that results in tremendous pressure. And it is the pressure of the steam which drives the turbines. Heat alone would not drive them.[6] It follows that the commercial product of the wells at The Geysers is steam, not heat.

The second question is whether steam is a "gas" as that term is used in sections 611(a) [7] and 613(b)(1). Respondent concedes that for pur-

---

[5] SEC. 613. PERCENTAGE DEPLETION

(a) GENERAL RULE.—In the case of the mines, wells, and other natural deposits listed in subsection (b), the allowance for depletion under section 611 shall be the percentage specified in subsection (b), of the gross income from the property excluding from such gross income an amount equal to any rents or royalties paid or incurred by the taxpayer in respect of the property. Such allowance shall not exceed 50 percent of the taxpayer's taxable income from the property (computed without allowance for depletion). * * * In no case shall the allowance for depletion under section 611 be less than it would be if computed without reference to this section.

(b) PERCENTAGE DEPLETION RATES.—The mines, wells, and other natural deposits, and the percentages, referred to in subsection (a) are as follows:

(1) 27½ percent—oil and gas wells.

[6] Alp Hanson, a mechanical engineer who has much experience with turbine generators, made this very clear in his testimony.

[7] SEC. 611. ALLOWANCE OF DEDUCTION FOR DEPLETION.

(a) GENERAL RULE.—In the case of mines, oil and gas wells, other natural deposits and timber, there shall be allowed as a deduction in computing taxable income a reasonable allowance for depletion and for depreciation of improvements, according to the peculiar conditions in each case; such reasonable allowance in all cases to be made under regulations prescribed by the Secretary or his delegate. * * *

poses of this case the term "gas" as used in those sections is not limited to hydrocarbon gases. He takes the position, however, that in spite of this concession steam is not a "gas." He accordingly concludes that Thermal is not entitled to $27\frac{1}{2}$-percent depletion pursuant to the "oil and gas wells" provision in section 613(b)(1).

To support his position that steam is not a "gas," respondent argues that the term "gas" as it is used in the relevant statutory provisions includes only those fluids which maintain a gaseous state at ordinary room temperature and pressure. Because steam condenses into water at ordinary room temperature and pressure, respondent argues, it cannot be considered a "gas."

We do not agree. We must construe the terms used in the depletion statutes in light of their ordinary commercial usage. *Quartzite Stone Co.*, 30 T.C. 511 (1958), affd. 273 F. 2d 738 (C.A. 10, 1959); *Blue Ridge Stone Corporation* v. *United States*, 170 F. Supp. 569 (W.D. Va. 1959). On the basis of the record as a whole, we conclude that in the common parlance of the industries involved herein the term "gas" includes steam. The testimony of every expert witness in the trial of this case, except Joseph Berman who is an employee of respondent, included references to steam as a "gas." Even Berman conceded that other people disagree with his limited use of the term "gas." Moreover, the tenor of the record as a whole convinces us that people involved on a daily basis in the industries in question think of steam as a "gas."

In arguing that steam is not a "gas," respondent relies heavily on the definition of "gas" in the Mineral Resources Regulations, 30 C.F.R. sec. 221.2(o).[8] That definition is as follows:

> *Gas.* Any fluid, either combustible or noncombustible, which is produced in a natural state from the earth and which maintains a gaseous or rarefied state at ordinary temperature and pressure conditions.

Respondent makes the following statement on brief regarding this definition:

> Section 221.44 of these same regulations provides that the standard of pressure shall be 10 ounces above an atmospheric pressure of 14.4 pounds to the square inch, and the standard of temperature is 60 degrees Fahrenheit. These above prescribed conditions of pressure and temperature are "ordinary" or "room" conditions.

Reading the latter conclusions into the quoted definition, respondent concludes that the Mineral Resources Regulations limit the term "gas" to fluids which maintain a gaseous state at ordinary room temperature and pressure. Respondent accordingly argues that the Mineral Resources Regulations—as he construes them—are authority to support

---

[8] C.F.R., tit. 30—Mineral Resources, ch. II—Geological Survey, Department of the Interior, p. 302.

his view that the term "gas" as used in sections 611(a) and 613(b)(1) of the Internal Revenue Code is limited to fluids maintaining a gaseous form at room temperature and pressure.

We see no reason, and respondent suggests none, why the Mineral Resources Regulations should control the case at bar. Furthermore, we are not convinced that respondent correctly interprets the Mineral Resources Regulations. There is nothing in the structure of those regulations to indicate that section 221.44 modifies section 221.2 as respondent suggests. The former section is under the heading "Measurement of Production and Computation of Royalties." Section 221.2 is under the heading "Introduction; Definitions." The fact that definitions are under a separate heading of the regulations indicates that they are complete in themselves and require no modification by provisions under other headings. Furthermore, the text of section 221.44, set out in the footnote below,[9] does not in any way suggest that it is a modification of the definitions in section 221.2. As its title suggests, we think section 221.44 is concerned only with the measurement of gas, not with the definition of gas.

In his reply brief, respondent asserts that "The parties also agree upon an applicable definition of 'gas' to the issues here." Respondent then asserts that under the agreed upon definition, steam is not a "gas." These assertions are tantamount to a claim that petitioners conceded this vital question on brief. We think these assertions are an incorrect interpretation of petitioners' brief and require no further comment.

Because of the considerations we discuss above, we conclude that steam is a "gas" as that term is used in sections 611(a) and 613(b)(1).

The third question is whether the steam at The Geysers is an exhaustible resource. It is undisputed that if the steam is inexhaustible, Thermal is not entitled to an allowance for depletion. See Income Tax Regs., sec. 1.611–1(a)(1). Accordingly, respondent takes the position that the steam is inexhaustible and Thermal takes the contrary position.

The question presented is a difficult one for a judicial body. It involves the resolution of geological and engineering disputes. It must

[9] Sec. 211.44.  Measurement of gas.
Gas of all kinds (except gas used for purposes of production on the leasehold or unavoidably lost) is subject to royalty, and all gas shall be measured by meter (preferably of the orifice-meter type) unless otherwise agreed to by the supervisor. All gas meters must be approved by the supervisor and installed at the expense of the lessee at such places as may be agreed to by the supervisor. For computing the volume of all gas produced, sold, or subject to royalty, the standard of pressure shall be 10 ounces above an atmospheric pressure of 14.4 pounds to the square inch, regardless of the atmospheric pressure at the point of measurement, and the standard of temperature shall be 60° F. All measurements of gas shall be adjusted by computation to these standards, regardless of the pressure and temperature at which the gas was actually measured, unless otherwise authorized in writing by the supervisor.

be remembered that we are not sitting as a scientific forum. We are sitting as a court. We must accordingly decide the question for one party or the other. In so doing, we hope the witnesses will be clear that our conclusions are not based upon a lack of credibility, but upon our best attempt to resolve a difficult theoretical dispute.

Based upon our consideration of the record as a whole, including the lengthy testimony, the documentary evidence, and all the arguments raised in the briefs, we conclude that the steam at The Geysers is an exhaustible resource. We have made detailed findings of fact to support this conclusion. It is not necessary to repeat the findings here. Nor is it necessary to detail the evidence supporting our findings.[10] However, we want to comment on the expert witnesses who testified during the trial.

Petitioners' geologist, George C. Kennedy, and their petroleum engineer, Henry J. Ramey, Jr., are highly qualified in their professions. Both men conducted extensive field studies at The Geysers prior to testifying at the trial. Both men were exceedingly strong witnesses. Although they did not use exactly the same terminology, the testimony of each man was consistent with that of the other as to essential details. We say this despite respondent's argument to the contrary. We think his argument is based on an incorrect interpretation of Kennedy's testimony.

Respondent's geologist, Thomas S. Lovering, is highly qualified in his field. As a witness, however, he tended to waver. At times he came very close to agreeing with the basic theories of Kennedy and Ramey, albeit with different phraseology. At other times, however, he disagreed with their basic theories in the plainest terms possible. Moreover, Lovering had never visited The Geysers area prior to the trial. His testimony was therefore not founded upon a field study. While he did visit The Geysers during a weekend recess in the trial which came after his testimony on direct and cross-examination, his field examination of the area appeared to have been hurried and superficial. In the absence of personal field study, he often relied upon data furnished by Joseph Berman. As we indicate below, we are not convinced that Berman was qualified to do many of the things he was asked to do in the presentation of respondent's case.

Joseph Berman is an employee of respondent. From his testimony as a whole, we gather that most of his training and experience is in

---

[10] In his reply brief, respondent objects to certain testimony based on a publication by Allen and Day in 1927. He bases his objection on the hearsay rule. We think the objection is not well taken. It is a recognized exception to the hearsay rule that an expert may give opinions based on knowledge gained from treatises in his field. McCormick, Evidence, sec. 296, p. 620. Furthermore, respondent does not cite any place in the transcript where he objected to the testimony in question during the trial.

the areas of petrography and mineralogy. These fields concern the character and classification of rocks. While Berman was a sincere witness, we feel he was working outside of his field in this case. He was called upon to study and testify about matters that had little or nothing to do with the identification of rocks. Much of his testimony, for example, dealt with matters which are in the province of petroleum engineering.

In addition to arguing his positions on the three factual questions discussed above, respondent presents several legal arguments to persuade us that Thermal is not entitled to a 27½-percent depletion deduction. His first argument involves section 613(b)(7)[11] which allows a 15-percent depletion deduction for "all other minerals" not enumerated in section 613(b)(1) through section 613(b)(6). Respondent focuses on subsection 613(b)(7)(A) which excludes "water" from the category "all other minerals," thereby denying a 15-percent deduction for "water." Seizing upon this denial, respondent argues as follows:

Since Congress in Section 613(b)(7) specifically denied a depletion allowance of 15 percent to water and did not include it in any other percentage depletion provision of Section 613 of the Code, it is obvious that Congress did not intend that water existing in the form of steam should be granted the even larger depletion rate of 27½ per cent given for "gas wells" by Section 613(b)(1) of the Code.

We do not agree. We think respondent's argument is based upon a confusion of two ways in which the word "water" is used.[12] In a chemical sense, "water" is any substance with the chemical composition of $H_2O$. Chemically speaking, $H_2O$ has three forms—gaseous, liquid, and solid. Again speaking chemically, any of these three forms of $H_2O$ is "water." In common parlance, however, there are separate and distinct words to describe the three forms of $H_2O$: Gaseous $H_2O$—steam, vapor; liquid $H_2O$—water; solid $H_2O$—ice.

In respondent's argument, he takes the term "water" in section 613(b)(7)(A) to mean $H_2O$, or "water" in the chemical sense. Thus

[11] SEC. 613. PERCENTAGE DEPLETION.

(b)(7) 15 percent—all other minerals (including, but not limited to, aplite, barite, borax calcium carbonates, diatomaceous earth, dolomite, feldspar, fullers earth, garnet, gilsonite, granite, limestone, magnesite, magnesium carbonates, marble, mollusk shells (including clam shells and oyster shells), phosphate rock, potash, quartzite, slate, soapstone, stone (used or sold for use by the mine owner or operator as dimension stone or ornamental stone), thenardite, tripoli, trona, and (if paragraph (2)(B) does not apply) bauxite, flake graphite, fluorspar, lepidolite, mica, spodumene, and talc, including pyrophyllite), except that, unless sold on bid in direct competition with a bona fide bid to sell a mineral listed in paragraph (3), the percentage shall be 5 percent for any such other mineral (other than slate to which paragraph (5) applies) when used, or sold for use, by the mine owner or operator as rip rap, ballast, road material, rubble, concrete aggregates, or for similar purposes. For purposes of this paragraph, the term "all other minerals" does not include—

(A) soil, sod, dirt, turf, water, or mosses; or

(B) minerals from sea water, the air, or similar inexhaustible sources.

[12] In passing we wish to point out that we think respondent made this error several times during the trial and in the preparation of his briefs.

he argues that if Congress specifically excluded $H_2O$ from section 613(b)(7), it must not have thought that $H_2O$ is included in sections 613(b)(1) through (b)(6).

We think, however, that the term "water" in section 613(b)(7)(A) does not refer to $H_2O$, or "water" in the chemical sense. We think it refers to "water" in the ordinary sense, or liquid $H_2O$. We are convinced of this because many, if not all, of the other terms in section 613(b) are clearly not chemical terms. Examples of such terms are "clay," "sand," "stone," "clam shells," "rip rap," and "sod." Furthermore, courts interpret the terms used in the depletion statute in light of their ordinary usage. *Quartzite Stone Co., supra; Blue Ridge Stone Corporation* v. *United States, supra.*

Respondent's second argument also involves the term "water." This argument runs as follows:

> It may be noted that Congress and the Code employed only the terms "water" and "gas"; such terms as "gaseous water" or "liquid water" were not used. Petitioners' position, it would seem, demands Congress should have employed such positive terms as "gaseous gas" or "liquid oil," or such negative terms as "non-solid water" or "non-solid-non-gaseous water."

Respondent concludes from this that Thermal's position is incorrect and that it is accordingly not entitled to 27½ percent depletion.

We think this argument is answered by the discussion of the first argument. We think Congress did, in effect, use the phrase "liquid water" in section 613(b)(7)(A), in the sense in which respondent is using the phrase "liquid water." The word "water" as respondent uses it in the phrase "liquid water" means $H_2O$. The liquid form of $H_2O$ is "water," as that word is used in common parlance. Because Congress used the word "water" in its ordinary sense, it in effect used the phrase "liquid water" in the sense in which respondent uses that phrase.

Respondent's third argument is that Congress never considered geothermal steam when it enacted section 613(a) and (b). Respondent concludes from this that Thermal is not entitled to 27½-percent depletion on geothermal steam.

We do not agree. There is no indication in the record that Congress did not consider geothermal steam when it enacted sections 613(a) and (b). It would indeed be perilous to cast the burden of taxation on the basis of speculation about specific cases actually envisioned by Congress when it enacted a statute using general terms such as "gas." Furthermore, we know of no rule, and respondent cites none, that a taxpayer must show that Congress actually envisioned his spe-

cific situation when it employed general terms to enact legislation the benefit of which he seeks.

Respondent's final argument focuses on the composition of the steam at The Geysers. He argues that the steam is a combination of earth heat and water. He argues further that percentage depletion is not allowable separately either for earth heat or for water. He then says that "it strains logic to conclude that Congress intended a combination of these two components [to] achieve what was denied them separately."

As we indicate above, the steam at The Geysers is more than its component parts. It is not simply earth heat and water. These elements in combination produce a gaseous fluid with tremendous pressure. The pressure makes the steam more than mere heat and water. Viewed in this manner, we find no logical difficulty in concluding that the steam at The Geysers is subject to percentage depletion, even assuming *arguendo* that earth heat and water considered separately are not subject to such depletion.

We thus conclude against respondent on each of the legal arguments he raises. Because we also decide the factual questions against him, we hold on the first issue that Thermal is entitled to deduct percentage depletion at the rate of 27½ percent against gross income received from geothermal steam wells at The Geysers.

The second issue is whether all petitioners including Thermal are entitled to deduct under section 263(c) [13] the intangible costs of drilling and developing geothermal steam wells. In his original brief, respondent states that if we conclude that the product of geothermal steam wells is a "gas" as that term is used in section 613(b)(1), then the section 263(c) issue is resolved.[14] Because we conclude above that geothermal steam is a "gas" as that term is used in section 613(b)(1), we hold for the petitioners on the second issue.

Because of our disposition of the first two issues, or the primary issues, the alternative issues are moot.

Reviewed by the Court.

*Decisions will be entered under Rule 50.*

FEATHERSTON, *J.*, did not participate in the consideration and disposition of this case.

---

[13] SEC. 263. CAPITAL EXPENDITURES.

(c) INTANGIBLE DRILLING AND DEVELOPMENT COSTS IN THE CASE OF OIL AND GAS WELLS.—Notwithstanding subsection (a), regulations shall be prescribed by the Secretary or his delegate under this subtitle corresponding to the regulations which granted the option to deduct as expenses intangible drilling and development costs in the case of oil and gas wells and which were recognized and approved by the Congress in House Concurrent Resolution 50, Seventy-ninth Congress.

[14] Respondent concedes that for purposes of this case the term "gas" as used in sec. 263(c) is not limited to hydrocarbon gases.

SIMPSON, *J.*, concurring: I have agreed with the decision of the majority, but I wish to make clear that my conclusion was reached without considering whether the term "gas" as used in section 613 (b) (1) should be limited to hydrocarbonaceous products. The respondent conceded that for purposes of this case the term was not so limited, and as a result of that concession, the parties have not presented and developed the factual and legal arguments relating to whether the legislative history indicates that when Congress allowed 27½-percent depletion for gas, it had in mind only hydrocarbonaceous gases. This issue is such that it is inadvisable for us to consider it without development by the parties and impracticable to request the parties to develop such issue. Accordingly, I have reached my conclusion simply on the basis of the issue that was developed in the case—whether the term "gas" as generally used and understood includes steam—and I agree that it does. Webster's New International Dictionary (3d ed. 1961).

DRENNEN, IRWIN, and STERRETT, *JJ.*, agree with this concurring opinion.

---

RAUM, *J.*, dissenting: This is depletion run riot. I cannot believe that Congress ever intended to confer these extraordinary tax benefits at the 27½-percent rate, wholly unrelated to taxpayer's investment in the property in circumstances such as are present here, whatever may have been its alleged intention to further a national policy of encouraging the extraction of petroleum or other like natural resources. Regardless of whether steam may technically be regarded as "gas," it is at best doubtful that it is so generally considered in common usage. Accordingly, I would not reach this rather eccentric result, cf. *Nix* v. *Hedden*, 149 U.S. 304, particularly since petitioner is seeking to obtain a highly artificial tax benefit and it has long been established that deductions and exemptions from taxation are to be narrowly construed. Cf. *Bingler* v. *Johnson*, 394 U.S. 741, 752; *Commissioner* v. *Jacobson*, 336 U.S. 28, 49; *United States* v. *Stewart*, 311 U.S. 60, 71; *Helvering* v. *Northwest Steel Mills*, 311 U.S. 46, 49; *New Colonial Co.* v. *Helvering*, 292 U.S. 435, 440. Indeed, it has been said that "a well founded doubt is fatal to the claim [of tax exemption]." *Bank of Commerce* v. *Tennessee*, 161 U.S. 134, 146. When one considers that Congress has provided for percentage depletion measured by *less* than 27½ percent in respect of natural resources other than from "oil and gas wells" and that it has specifically indicated that there is to be no percentage depletion whatever in respect of "water" (sec. 613(b)), it seems almost beyond belief that it intended to grant a 27½-percent bonanza for water vapor.

Nor is the contrary conclusion required by reason of the Commissioner's so-called concession as to the meaning of the term "gas" as used in the statute, for that is a question of law and it has been firmly established that concessions or stipulations of law are not binding upon the courts. *Swift & Co.* v. *Hocking Valley Ry. Co.*, 243 U.S. 281, 289; *Estate of Sanford* v. *Commissioner*, 308 U.S. 39, 51; *Nelson* v. *Montgomery Ward*, 312 U.S. 373, 376; *First-Mechanics Nat. Bank* v. *Commissioner*, 117 F. 2d 127, 131 (C.A. 3); *London-Butte Gold M. Co.* v. *Commissioner*, 116 F. 2d 478, 480 (C.A. 10); *Commissioner* v. *Ehrhart*, 82 F. 2d 338, 339 (C.A. 5); *John A. Nelson Co.* v. *Commissioner*, 75 F. 2d 696, 697 (C.A. 7), reversed on other grounds 296 U.S. 374; *Smith* v. *Commissioner*, 59 F. 2d 553, 538 (C.A. 7); *Ernst Kerry Co.*, 1 T.C. 249, 265; *Volunteer State Life Insurance Co.*, 35 B.T.A. 491, 496, reversed on other grounds 110 F. 2d 879 (C.A. 6); *Ohio Clover Leaf Dairy Co.*, 8 B.T.A. 1249, 1256, affirmed per curiam 34 F. 2d 1022 (C.A. 6), certiorari denied 280 U.S. 588. I know of no exception to this rule that would justify an erroneous interpretation of the statute merely "for purposes of this case."

TIETJENS and TANNENWALD, *JJ.*, agree with this dissent.