BARRY H. NEWBORN AND MICHELE NEWBORN,
PETITIONERS *v.* COMMISSIONER OF
INTERNAL REVENUE, RESPONDENT

Docket No. 21581-84.          Filed April 19, 1990.

*Louis A. Prosperi,* for the petitioners.
*Frank A. Falvo,* for the respondent.

CHABOT, *Judge:* Respondent determined a deficiency in Federal individual income tax against petitioners for 1980 in the amount of $4,000. The issue for decision is whether petitioners are entitled to a residential energy credit under section 44C[1] for their purchase and installation of certain energy-saving equipment in connection with their new home.

### FINDINGS OF FACT

Some of the facts have been stipulated; the stipulations and the stipulated exhibits are incorporated herein by this reference.

When the petition was filed in the instant case, petitioners, husband and wife, resided in Hollidaysburg, Pennsylvania.

---

[1]Sec. 44C was subsequently redesignated sec. 23. See bracketed material at end of note 2, *infra.*

Unless indicated otherwise, all section and chapter references are to sections and chapters of the Internal Revenue Code of 1954 as in effect for the year in issue.

Petitioners had a house built in Hollidaysburg and began living in it in October 1980. They used the house as their principal residence in 1980 and later. Petitioners bought and had installed in the house in 1980 a Solargy Energy Conservation Module (hereinafter sometimes referred to as the Solargy System) that was acquired from Solargy Systems of Wescorp. The installation of the Solargy System was completed in October 1980.

Petitioners paid $15,500 for the Solargy System in 1980. This includes the cost of the Solargy System as well as the costs of on-site preparation, assembly, and original installation of the Solargy System. The vendor who sold and the contractor who installed the Solargy System told petitioners that the Solargy System would qualify for the residential energy credit under section 44C. However, respondent did not certify to the Solargy System manufacturer that the Solargy System qualified for this credit.

On their 1980 Federal income tax return, petitioners claimed a $4,000 energy credit under section 44C for qualified renewable energy source expenditures for the Solargy System. Petitioners reported their Solargy System expenditure on Form 5695 as an expenditure for geothermal renewable energy property. The Federal income tax imposed on petitioners for 1980 is sufficient to permit the allowance of a $4,000 energy credit under section 44C, to the extent this credit is otherwise allowable.

*How The Solargy System Works*

To heat a house, the Solargy System extracts heat energy from underground water (hereinafter sometimes referred to as groundwater) and converts it to high-temperature heat. The groundwater is drawn from a well that accumulates water from natural openings in beds of sedimentary rock beneath the surface of the earth. The groundwater is stored in two concrete underground storage tanks, both of which are about 5 feet deep and 10 feet long. The tops of the tanks are buried below the frost line, at about 3 feet below the earth's surface. The earth acts as insulation to aid the groundwater (including that stored in the underground storage tanks) in retaining its heat energy.

Water has very high specific heat (the amount of energy required to raise the temperature of a unit weight of any substance one degree on a temperature scale), compared to the specific heat of air, and can store great amounts of energy. Relatively little energy is needed to extract heat from water because of its high specific heat.

The Solargy System works generally as follows to heat a house: (1) Groundwater is drawn and stored in the underground concrete tanks; (2) the groundwater flows from the tanks into a water heat exchanger, where the water flows around a refrigerant tube in the exchanger; (3) in the exchanger the liquid refrigerant absorbs heat from the groundwater, boils, and changes into a gas (this process occurs because heat is always transferred from a warmer substance to a cooler substance); (4) the gas is squeezed by a compressor and the temperature of the gas is raised as a result; (5) this high-temperature, high-pressure gas then moves to the air heat exchanger, where it surrenders heat as a fan blows air across the heat exchanger coils containing the gas; (6) as it loses heat, the gas changes back into a hot liquid; (7) the hot liquid passes through an expansion valve that reduces pressure, and thus reduces temperature; (8) the low-temperature, low-pressure liquid returns to the water heat exchanger and the process begins again; and (9) the groundwater which originally entered the water heat exchanger is returned during this process from the water heat exchanger to the ground. Upon discharge, the groundwater is as pure as when it entered the Solargy System. The heat extracted from the groundwater is continually replaced by the heat in the earth. There is no adverse environmental impact from the use of the Solargy System.

To cool the house, this process is reversed. The Solargy System sends the liquid refrigerant through the expansion valve where it becomes a cool vapor. The vapor travels directly to the air heat exchanger, where it cools circulating air in the house by absorbing heat from the air. The warm refrigerant then goes to the compressor and to the water heat exchanger, where the heat in the refrigerant is absorbed by the groundwater and the cycle is repeated.

The groundwater for the Solargy System used by petitioners is supplied from a well that petitioners drilled. The

well was drilled to a depth of 412 feet but groundwater enters the well from various points. The groundwater is then pumped to the concrete underground storage tanks described above, where it is stored for use in the Solargy System. The groundwater in the well on petitioners' property maintains a constant, year-round temperature, regardless of seasonal changes in air temperature. This groundwater temperature is about 13-14° Centigrade (about 55-57° Fahrenheit).

The Solargy System is a water-to-air heat pump. Circulating water provides the heating or cooling energy. The difference in temperature between the refrigerant and the groundwater is the primary source of energy transfer to heat or cool the building.

Petitioners' use of the Solargy System saves a substantial amount of energy compared with the energy that would be used by an electrical, gas, or oil-burning heating system. The Solargy System and other systems that use groundwater are about three to five times more efficient in the use of energy than gas, oil burning, or electrical heat systems, and about twice as efficient as air-to-air heat pumps.

The Solargy System is different in efficiency from air-to-air heat pumps because of the poor efficiency of air-to-air heat pumps at low temperatures. As temperatures fall, the air loses the heat contained therein and can no longer be used as a practical heat source. Air-to-air heat pumps in most of the United States require that a backup conventional system be operated when the air-to-air heat pump is turned off at lower temperatures because of declining efficiency. In contrast, the Solargy System requires little or no use of a backup conventional system; it remains highly efficient at all outside temperatures because the temperature of the groundwater used by the Solargy System varies little with the seasons and facilitates relatively constant output from the Solargy System.

There is no physical or chemical change in solar energy that may be absorbed by the groundwater used by the Solargy System. On the other hand, a physical or chemical change in the solar energy occurs in the production of fossil fuel, such as coal or wood. The energy in coal and wood is

derived indirectly from solar energy, and is stored in the form of chemical energy.

Petitioners' expert witness concludes that the heat energy in the groundwater is derived from the sun. He states that the "solar input * * * which would govern the temperature of the incoming rainfall (which becomes groundwater) and the temperature of the soil on which the rain impinges and ultimately infiltrates" provides "roughly 20,000 times that of all the other sources combined". He states that "The heat extracted from the groundwater used by the Solargy System is replenished by the continuous input of heat energy from the sun."

Respondent's expert witness concludes that the heat energy in the groundwater is derived from "the earth's internal heat flow. * * * Heat produced by solar radiation does not penetrate deeply into soil or rock, it remains in a thin surface layer ca. [about] 4 to 5 inches thick. The only way in which groundwater could be considered a form of solar energy would be if it flowed underground so rapidly as to not lose any of its stored solar energy [that had been absorbed during precipitation]. This occurrence could not possibly occur in the soils and rocks which crop out in" the area where petitioners live.

## OPINION

Section 44C[2] provides, in part, for a residential energy credit for qualified renewable energy source expenditures.

---

[2]Sec. 44C provides, in pertinent part, as follows:

SEC. 44C. RESIDENTIAL ENERGY CREDIT.

(a) GENERAL RULE.—In the case of an individual, there shall be allowed as a credit against the tax imposed by this chapter [i.e., chapter 1, relating to normal taxes and surtaxes] for the taxable year an amount equal to the sum of—

    (1) the qualified energy conservation expenditures, plus

    (2) the qualified renewable energy source expenditures.

        \*        \*.        \*        \*        \*        \*        \*

(c) DEFINITIONS AND SPECIAL RULES.—For purposes of this section—

        \*        \*        \*        \*        \*        \*        \*

    (2) RENEWABLE ENERGY SOURCE EXPENDITURE.—

        (A) IN GENERAL.—The term "renewable energy source expenditure" means an expenditure made on or after April 20, 1977, by the taxpayer for renewable energy source property installed in connection with a dwelling unit—

            (i) which is located in the United States, and

            (ii) which is used by the taxpayer as his principal residence.

        \*        \*        \*        \*        \*        \*        \*

Under section 44C(c)(5), this includes expenditures for property which, when installed in connection with a dwelling, transmits or uses (a) solar energy or (b) energy derived from geothermal deposits, for the purpose of heating or cooling the dwelling or providing hot water or electricity for use within the dwelling.

The parties' dispute focusses on whether the Solargy System qualifies under section 44C(c)(5)(A)(i) as property which transmits or uses solar energy or which transmits or uses energy derived from geothermal deposits.[3]

Petitioners contend that the Solargy System qualifies for the residential energy tax credit, under the statute and the regulations, because the Solargy System uses direct solar energy derived through heat stored in groundwater.[4] Petitioners maintain that, if this Court were to conclude that the Solargy System uses indirect solar energy, then we

---

(5) RENEWABLE ENERGY SOURCE PROPERTY.—The term "renewable energy source property" means property—
    (A) which, when installed in connection with a dwelling, transmits or uses—
        (i) solar energy, energy derived from the geothermal deposits (as defined in section 613(e)(3)), or any other form of renewable energy which the Secretary specifies by regulations, for the purpose of heating or cooling such dwelling or providing hot water or electricity for use within such dwelling, or
        (ii) wind energy for nonbusiness residential purposes,
    (B) the original use of which begins with the taxpayer,
    (C) which can reasonably be expected to remain in operation for at least 5 years, and
    (D) which meets the performance and quality standards (if any) which—
        (i) have been prescribed by the Secretary by regulations, and
        (ii) are in effect at the time of the acquisition of the property.
(6) REGULATIONS.—
    (A) CRITERIA; CERTIFICATION PROCEDURES.—The Secretary shall by regulations—
        (i) establish the criteria which are to be used in (I) prescribing performance and quality standards under paragraphs (3), (4), and (5), or (II) specifying any item under paragraph (4)(A)(viii) or any form of renewable energy under paragraph (5)(A)(i), and
        (ii) establish a procedure under which a manufacturer of an item may request the Secretary to certify that the item will be treated, for purposes of this section, as insulation, an energy conserving component, or renewable energy source property.
    (B) CONSULTATION.—Performance and quality standards regulations and other regulations shall be prescribed by the Secretary under paragraphs (3), (4), and (5) and under this paragraph only after consultation with the Secretary of Energy, the Secretary of Housing and Urban Development, and other appropriate Federal officers.

[Sec. 44C was redesignated sec. 23 by sec. 471(c)(1) of the Deficit Reduction Act of 1984, Pub. L. 98-369, 98 Stat. 494, 826. That redesignation and other amendments do not affect the instant case.]

[3] The parties have stipulated that all the other relevant requirements of sec. 44C have been met.

[4] On Form 5695 of petitioners' 1980 Federal income tax return, they list their expenditure for installing the Solargy System as a *geothermal* renewable energy source item. Respondent does not contend that this is an evidentiary admission that the Solargy System is not property that uses solar energy, or that petitioners are estopped from arguing that the Solargy System is a solar-powered system rather than a geothermal-powered one.

should also hold that section 1.44C-2(f)(1), Income Tax Regs. (now section 1.23-2(f)(1), Income Tax Regs.), is invalid in that it incorrectly restricts the residential energy credit to applications of direct solar energy. Petitioners maintain that, if this Court were to decide that the Solargy System's energy source is geothermal rather than solar in nature, then we should also hold that section 1.44C-2(h), Income Tax Regs. (now section 1.23-2(h), Income Tax Regs.), is invalid in that it improperly imposes a 50° Centigrade (122° Fahrenheit) requirement on the temperature of groundwater. Petitioners contend that sections 1.44C-2(f)(1) and 1.44C-2(h), Income Tax Regs., are interpretative rather than legislative. Thus, petitioners argue, the regulations are not entitled to the greater deference accorded to legislative regulations, and should be invalidated because they improperly add requirements to a statute which is unambiguous on its face. Also, to the extent we upheld section 1.44C-2(h), Income Tax Regs., in *Peach v. Commissioner*, 84 T.C. 1312 (1985), affd. without published opinion 805 F.2d 393 (4th Cir. 1986), petitioners contend that *Peach* was decided erroneously.

Respondent asserts that the Solargy System does not use solar energy, but rather that in using groundwater drawn from a deep well, the Solargy System's energy is derived from heat generated within the earth. Respondent asserts that, if this Court were to determine that the source of the heat in the underground water is derived from solar energy, then we should also hold that petitioners fail to meet the requirement under the regulations that solar energy property use fuel or energy which is directly derived from sunlight. Respondent argues that the Solargy System does not qualify as geothermal property under section 1.44C-2(h), Income Tax Regs., because it does not use water which has a temperature of more than 50° Centigrade at the wellhead. Respondent asserts that the regulations are legislative, and thus must be upheld because they are reasonable and not plainly inconsistent with the statute.

We agree with respondent's conclusion that petitioners are not entitled to the credit.

Under section 44C(c)(5)(A)(i), the Solargy System can qualify as "renewable energy source property" only if it

transmits or uses (1) "solar energy" or (2) "energy derived from geothermal deposits (as defined in section 613(e)(3))".[5] The statutory terms "solar energy" (in sec. 44C(c)(5)(A)(i)) and "natural heat" (in sec. 613(e)(3)) are vague; they have no "plain meaning", as applied to the context of the instant case. Accordingly it is appropriate to delve into legislative history to determine if the choices made by the regulations are permissible. Our examination of the legislative histories of the solar energy and geothermal deposits provisions convince us that in each instance the choice made by the regulations not only is permissible but appears to be the choice to which the legislative histories point.

## I. *Solar Energy*

We consider first whether the Solargy System qualifies as property which transmits or uses solar energy.

### a. *Statute*

The statute does not define the term "solar energy". The term appears in the investment credit provisions (secs. 46(b)(2)(A)(II), 48(1)(2)(A)(ii), and 48(1)(4)), but is not defined there.

Except for minute forms of energy that come to us from other sources (e.g., distant stars in our galaxy, other galaxies, or interstellar bodies), in a sense all our energy may be said to have come from the sun or from the molten interior or radioactive elements of the earth. Thus, the heat we derive from burning oil and natural gas supposedly came from the bodies of dinosaurs and other animals that derived their warmth from the sun and their sustenance from plants (or from other animals that derived their sustenance from plants) that in turn depended on energy that came from the sun. Without getting into an extended analysis, we are satisfied that the "plain meaning" of the term "solar energy" can arguably be so broad as to include almost all energy, with the result that oil furnaces and natural gas furnaces would qualify as renewable energy source property under that interpretation. That result is sufficiently absurd

---

[5]The statute provides a third alternative—property which transmits or uses "any other form of renewable energy which the Secretary specifies by regulations". Petitioners do not contend that the Solargy System qualifies under this third alternative.

in light of the purposes of the legislation as to persuade us that recourse must be had to legislative history and regulations for a more limiting definition of the term "solar energy".

Thus, we disagree with petitioners' contention that the Solargy System is renewable energy source property because it uses solar energy "Under the Plain Language of Section 44C(c)(5)(A)(i)".

## b. *Regulations—Meaning*

Section 1.44C-2(f)(1), Income Tax Regs.,[6] defines "solar energy" as "energy derived directly from sunlight (solar radiation)." Fuel or energy which is indirectly derived from sunlight does not qualify. The regulation gives the following as examples of fuel or energy indirectly derived from sunlight: "fossil fuel or wood or heat in underground water". In the supplementary information that accompanied the publication of T.D. 7717, originally promulgating this regulation (45 Fed. Reg. 57713, 1980-2 C.B. 8),[7] the Treasury Department describes comments regarding proposed regulations, and the Department's response, as follows:

---

[6]Sec. 1.44C-2(f)(1), Income Tax Regs., provides as follows:

SEC. 1.44C-2 Definitions.

For purposes of section 44C and the regulations thereunder—

    \*     \*     \*     \*     \*     \*     \*

(f) *Solar energy property—*(1) *In general.* The term "solar energy property" means equipment and materials of a solar energy system as defined in this paragraph (and parts solely related to the functioning of such equipment) which, when installed in connection with a dwelling, transmits or uses solar energy to heat or cool the dwelling or to provide hot water or (in the case of expenditures made after December 31, 1979) electricity for use within the dwelling. For this purpose, solar energy is energy derived directly from sunlight (solar radiation). Property which uses, as an energy source, fuel or energy which is indirectly derived from sunlight (solar radiation), such as fossil fuel or wood or heat in underground water, is not considered solar energy property. Materials and components of "passive solar systems" as well as "active solar systems", or a combination of both types of systems may qualify as solar energy property.

[This text embodies amendments by T.D. 8146, 52 Fed. Reg. 26667, 1987-2 C.B. 7, 12, promulgated June 11, 1987, but applicable to expenditures made after Dec. 31, 1979. 1987-2 C.B. at 8. The 1987 amendments are (in the first sentence) the reference to electricity and (in the third sentence) the substitution of "heat in underground water," for "heated underground water". For taxable years beginning after Dec. 31, 1983, the regulation is redesignated sec. 1.23-2(f)(1). 1987-2 C.B. 7-8.]

[7]T.D. 8146 indicates that the reference to electricity is a substantive change from T.D. 7717, but does not explain the changed language in the third sentence (see bracketed material at the end of note 6, *supra*) or otherwise indicate any change in the meaning of par. (f)(1) of the regulation.

### DEFINITIONS OF QUALIFIED ITEMS

A number of comments requested that the definitions of various items qualifying for the credit be expanded, e.g., that the definition of insulation be expanded to include awnings and shades; that the definition of a storm or thermal window be revised to include window films; *and that the definition of solar energy property be made to include* woodburning stoves[8] *or heat pumps. The regulations have not been expanded to include these items* because we believe that Congress did not intend their inclusion. * * * [Emphasis added.]

The policy distinction between direct and indirect sunlight is not explained in the regulation or in the supplementary information. (Presumably, it is related to the concept that a line has to be drawn somewhere.) The supplementary information states that "we believe that Congress did not intend their [e.g., heat pumps] inclusion", but does not favor us with a clue as to what in the legislative history of the statute caused the Treasury Department to arrive at its stated belief as to the Congress' intent.

Also, the golden thread that ties "fossil fuel", "wood", and "heat in underground water" together as indirect solar energy is not immediately apparent.

Nevertheless, the treatment of "heat in underground water", and the statement that heat pumps do not qualify as solar energy property, make it appear that the Solargy System does not qualify as solar energy property under the regulation.

Petitioners contend that the regulation's statement, that heat in underground water is energy derived indirectly from sunlight, is a factual conclusion and is erroneous. We disagree. In the context in which it appears, this statement is part of the definition and not merely a factual conclusion from the definition. "Direct" and "indirect" are not self-defining terms. Their meanings take shape from the words used to define or otherwise describe them. In the regulation, the Treasury Department has chosen to use examples to indicate the location of the line separating direct from indirect. One example the Treasury Department has chosen to use is that heat in underground water is at best indirect solar energy.

---

[8] In *Olson v. Commissioner,* 81 T.C. 318 (1983), we held that a woodburning stove does not qualify as renewable energy source property, and so disallowed the residential energy credit there claimed.

We conclude that the Solargy System does not qualify as solar energy property under section 1.44C-2(f)(1), Income Tax Regs.

### c. *Regulations—Validity*

The parties argue as to whether the regulation is "legislative" or "interpretative". (We give less weight to interpretative regulations. E.g., *Estate of Boeshore v. Commissioner,* 78 T.C. 523, 527 n. 5 (1982).) The parties argue as to the rationale and internal consistency of the regulation. Because we conclude that the legislative history is consistent with the conclusion that the regulation appears to reach—that the Solargy System does not qualify as solar energy property—it is immaterial that there is some logic to petitioners' arguments as to what policy the Congress ought to have adopted or how the regulations ought to have been drafted (*Fulman v. United States,* 434 U.S. 528, 534, 536 (1978); *CSX Corp. v. Commissioner,* 89 T.C. 134, 153 (1987)), or even petitioners' arguments as to whether the regulation is legislative or interpretative.

We proceed to consider the legislative history of section 44C.[9]

On July 13, 1977, the House Ways and Means Committee reported H.R. 6831 (title II). In H. Rept. 95-496, part III, p. 41 (H. Rept. 95-543, vol. II, p. 157), 1978-3 C.B. (Vol. 2) 67, 71, 103, the committee describes its "Residential Solar and Wind Energy Equipment Credit". The report states that the reasons for providing such a credit include encouraging

---

[9]Sec. 44C was enacted by sec. 101(a) of the Energy Tax Act of 1978 (Pub. L. 95-618, 92 Stat. 3174, 3175). The bill that the Congress enacted was H.R. 5263. As passed by the House of Representatives, H.R. 5263 was a 2½-page bill which merely modified the tariffs on certain kinds of imported bicycle parts. On July 13, 1977, the House Ways and Means Committee reported title II of H.R. 6831 (H. Rept. 95-496, part III, 1978-3 C.B. (Vol. 2) 71). On July 27, 1977, the House Ad Hoc Committee on Energy reported H.R. 8444 (H. Rept. 95-543). Title II of H.R. 8444 is title II of H.R. 6831; Volume II of H. Rept. 95-543 includes, as part D, the Ways and Means Committee report on H.R. 6831. (See H. Rept. 95-541 (Vol. I) 3, (Vol. II) 113.) The Senate used H.R. 5263 as its vehicle for considering energy tax policy. The Senate Finance Committee's report is S. Rept. 95-529, 1978-3 C.B. (Vol. 2) 199. When the Senate was concluding its action on H.R. 5263, "In order to bring the House energy tax provisions into conference, the Senate added a title II [to H.R. 5263] which is the text of H.R. 8444 (the National Energy Act) as passed by the House." H. Rept. 95-1773, S. Rept. 95-1324 (Conference Rept.) 41, 1978-3 C.B. (Vol. 2) 313. The Senate amendment is 323 pages long, the last 150 pages of which consist of the tax portions of H.R. 8444.

Accordingly, the House of Representatives' portion of the legislative history of the Energy Tax Act of 1978 includes reports and activities with regard to H.R. 6831 and H.R. 8444, as well as the House's activities with regard to the Conference Report on H.R. 5263.

the purchase and installation of solar and wind energy equipment, thus potentially resulting in oil and natural gas savings; spurring the purchase and installation of such equipment and the development of solar and wind energy technology; and encouraging the use of hot water heating, then the most practical and inexpensive use of solar energy.

Under the subtitle, "Qualifying property," the report (H. Rept. 95-496, part III, pp. 43-44 (H. Rept. 95-543, vol. II, pp. 159-160), 1978-3 C.B. (Vol. 2) 105-106) states as follows:

The credit for solar energy property applies to solar equipment (and parts solely related to the functioning of such equipment) which, when installed in connection with a dwelling, uses solar energy to heat or cool the dwelling or to provide hot water for use within the dwelling. Generally, a solar energy equipment system involves the transformation of sunlight into heat or electricity through the use of such components as collectors (to absorb sunlight and create hot air), rockbeds (to store hot air), thermostats (to activate fans which circulate the hot air) and heat exchangers (to utilize the hot air to create hot water). * * *

Solar and wind energy property does not include conventional heating or cooling systems which serve to supplement ("back up") the solar or wind energy equipment in heating or cooling the residence.

On August 5, 1977, the House of Representatives passed H.R. 8444.

The Staff of the Joint Committee on Taxation prepared a series of pamphlets for the use of the Senate Finance Committee in its consideration of energy tax legislation. The second of these pamphlets (Residential Tax Credits, JCS 50-77 (Sept. 15, 1977), hereinafter the Jt. Comm. Staff Pamphlet No. 2) presents a "Background" section with separate descriptions of "Solar energy equipment" (pp. 21-22), "Heat pumps" (pp. 22-25), and "Wind energy" (p. 26). The heat pump discussion deals only with heat pumps that extract heat from outside air to warm houses and exhaust heat to outside air (the air conditioner mode) to cool houses. The Jt. Comm. Staff Pamphlet No. 2 describes the House-passed bill (pp. 26-28) without referring to heat pumps.

The Jt. Comm. Staff Pamphlet No. 2 then discusses Senate Action in the 94th Congress, the Congress immediately preceding the one that enacted the Energy Tax Act of 1978, Pub. L. 95-618, 92 Stat. 3174. The Jt. Comm. Staff Pamphlet No. 2 (p. 29) points out that the Senate Finance

Committee's 94th Congress bill included a credit "for qualifying heat pump expenditures. This credit was half the amount of the credit for solar or geothermal equipment expenditures."[10] Then, in discussing other proposals, the Jt. Comm. Staff Pamphlet No. 2 (p. 30) notes proposals to add to the House-passed bill various categories of qualifying property, including "(c) heat pumps". The Jt. Comm. Staff Pamphlet No. 2 (p. 31) concluded as follows:

### H. Areas for Committee Consideration

The House bill and the history of the energy tax provisions in the 94th Congress indicate that the basic decisions to be made with regard to a tax incentive for residential solar and wind energy equipment include the following:

(1) the amount of the credit;

(2) the period during which the credit is to be available;

(3) whether the types of equipment specified in the House bill should qualify for the credit;

(4) *whether any types of equipment not specified in the House bill (such as heat pumps and geothermal energy equipment) should qualify for the credit;* [Emphasis added.]

(5) whether the credit should be confined to installations on principal residences (owned and rented); and

(6) whether the credit should be refundable or nonrefundable.

---

[10]In its work on the Tax Reform Act of 1976 (Pub. L. 94-455, 90 Stat. 1520), the Senate Finance Committee added title XX, Energy Related Provisions, to the bill (H.R. 10612, as reported June 10, 1976). In proposed new Code sec. 44B, the bill provided a credit for "qualified heat pump expenditures" at half the rate provided for "qualified solar energy equipment expenditures plus qualified geothermal energy expenditures" (proposed new Code sec. 44B(a) (final flush). The bill defined "heat pump equipment" as follows (proposed new Code sec. 44B(c)(6)):

(6) HEAT PUMP EQUIPMENT.—The term "heat pump equipment" means equipment—
(A) which, when installed in or on, or when connected to, a building uses a compressible refrigerant system which is reversible to move heat into and out of a building by rejecting or absorbing heat from water, the ground, or the air;
(B) the original use of which commences with the taxpayer; and
(C) which has a useful life of at least 3 years.

The Senate Finance Committee's 1976 report on the solar and geothermal energy credits focusses on the use of energy sources that replace the need to use fossil fuels (S. Rept. 94-938, p. 552, 1976-3 C.B. (Vol. 3) 49, 590). The report on the heat pump credit, on the other hand, focusses on "the lesser amount of electrical energy needed to power the heat pump as compared with the electricity required by traditional electric heating equipment" rather than the heat pump as a user of energy sources that substitute for fossil fuels. In effect, the heat pump was viewed as conservation equipment and not energy source equipment (S. Rept. 94-938, p. 555, 1976-3 C.B. (Vol. 3) 593). The 1976 report points out that solar and geothermal energy credits were provided in the House-passed energy tax bill, but that no "tax credit, or any tax incentive, for installation of a heat pump" was provided in the House-passed energy tax bill (S. Rept. 94-938, pp. 554, 557, 1976-3 C.B. (Vol. 3) 592, 595).

The Conference Report on the Tax Reform Act of 1976 omitted the energy-related provisions in entirety. H. Rept. 94-1515, S. Rept. 94-1236, pp. 519-520, 1976-3 C.B. (Vol. 3) 807, 923-924.

In the Senate Finance Committee's hearings, a representative of General Electric recommended tax credits for purchases of heat pumps. (Staff of Jt. Comm. on Taxation, Pamphlet 7A, Summary of Public Testimony on the Energy Proposals, JCS 55A-77 (Sept. 19, 1977).) Also, written statements by representatives of (1) the Air-Conditioning and Refrigeration Institute and (2) Borg-Warner, recommended tax credits for purchase of heat pumps. The Institute's written statement urged that both air-source and water-source heat pumps be added to H.R. 8444's list of other energy-conserving components. (Staff of Jt. Comm. on Taxation, Pamphlet 7B, Summary of Written Statements on the Energy Proposals, JCS 55B-77 (Sept. 22, 1977).)

The Senate Finance Committee, on October 21, 1977, reported the Energy Production and Conservation Tax Incentive Act, H.R. 5263. The Senate Finance Committee added "geothermal deposits (as defined in section 613(e)) which provide geothermal energy" to the categories of energy sources which may be used by "renewable energy source property". The Senate Finance Committee did not add any reference to heat pumps as renewable energy source property. However, the Senate Finance Committee did add "(viii) a heat pump which replaces an electric resistance heating system" (under proposed new section 44C(c)(4)(A)) to the categories included in the term "other energy-conserving component", for which a credit was to be available as an "energy conservation expenditure".

The Senate Finance Committee report (S. Rept. 95-529, p. 36, 1978-3 C.B. (Vol. 2) 199, 228), begins by stating the same reasons for change as contained in the House Ways and Means Committee report on H.R. 6831, *supra* (except for adding a reference to geothermal energy). The Finance Committee report contains the same language as the Ways and Means Committee report regarding the transformation of sunlight into heat or electricity through collectors, rockbeds, thermostats, and heat exchangers, as well as that concerning backup conventional systems. S. Rept. 95-529, pp. 39-49, 1978-3 C.B. (Vol. 2) 231-232. However, the Finance Committee report goes on to state as follows:

The credit for solar energy property applies to "passive solar systems" as well as "active solar systems," or any combination of both these

systems. An "active solar system" is based on the use of mechanically forced energy transfer, such as the use of fans to circulate solar generated energy. "Passive solar systems" are based on the use of conductive, convective, or radiant energy transfer, such as the use of portions of a residential structure which serve as solar furnaces so as to add heat to the residence. However, expenditures for materials and components which will serve a significant structural function in the dwelling (e.g., extra-thick walls) would not be eligible for the credit.

On October 31, 1977, the full Senate passed H.R. 5263. The bill as passed by the Senate was identical to the relevant parts of the bill as reported by the Finance Committee, except that: (1) The heat pump language appeared in paragraph (5)(A)(viii) of new Code section 44C(c) in the Senate-passed bill (instead of par. (4)(A)(viii) in the Finance Committee bill); and (2) use in the production of electricity was added to heating, cooling, and providing hot water, in the permissible uses of solar energy in paragraph (6)(A)(i) of new Code section 44C(c) of the Senate-passed bill (heating, cooling, and hot water were in par. (5)(A)(i) in the Finance Committee bill). Accordingly, the Finance Committee report properly reflects the relevant portions of the Senate-passed bill and not merely the Finance Committee bill.

About a year later, on October 12, 1978, the Conference Committee reported H.R. 5263 as the Energy Tax Act of 1978, and submitted a Conference report. H. Rept. 95-1773 and S. Rept. 951324, 1978-3 C.B. (Vol. 2) 309. As to the energy conservation credit, the conferees generally followed the House bill; in particular, heat pumps were not included in the categories of qualifying property. H. Rept. 95-1773, S. Rept. 95-1324, pp. 42-43, 1978-3 C.B. (Vol. 2) 314-315. As to the renewable energy source credit, the conferees generally followed the Senate amendment; however, the credit for solar energy equipment used in the production of electricity was deleted. H. Rept. 95-1773, S. Rept. 95-1324, p. 44, 1978-3 C.B. (Vol. 2) 316. On October 15, 1978, the Conference Committee's version was agreed to by the House and the Senate. The bill was signed by President Carter on November 9, 1978, and section 44C became law, applicable to taxable years ending on or after April 20, 1977.

From the foregoing, we reach the following conclusions:

*Firstly*, in enacting the Energy Tax Act of 1978, the Congress intentionally dealt with the treatment of heat pumps. One witness before, and two correspondents to, the Finance Committee urged the Committee to provide credits for expenditures for heat pumps. The Joint Committee on Taxation staff brought the proposals to the attention of the Finance Committee, reminded the Finance Committee of how it had dealt with heat pumps in the immediately preceding Congress, and listed treatment of heat pumps among the matters for the Committee to deal with. The Committee's bill includes a special provision for heat pumps, quite different from the provision in the immediately preceding Congress. The matter was focused on in the Conference Committee, which decided to remove the heat pump clause, while leaving intact most of the subparagraph in which the heat pump language had appeared.

*Secondly*, the Congress did not intend that heat pumps qualify as renewable energy source property by virtue of their use of solar energy. Air-to-air heat pumps use outside air as the heat reservoir; this air's heat energy appears to come directly from sunlight shining upon it, or from the ground which has been directly heated by sunlight. Water-to-air heat pumps, such as the Solargy System, use stored water as the heat reservoir; petitioners' expert witness testified that this water's heat energy comes directly from sunlight shining upon the water as it falls in the form of rain. If that were all that it took to qualify for the credit, then virtually all heat pumps would so qualify as renewable energy source property. But that analysis would make meaningless the Finance Committee's decision to allow heat pumps to qualify for the same credit under the "energy-conserving component" rubric. That analysis would make especially inexplicable the Finance Committee's restriction that a heat pump could qualify as an energy-conserving component only if the heat pump were to replace an existing electrical resistance heating system. Because the Finance Committee's decisions are inconsistent with an interpretation that ambient air and rainwater include solar energy, within the meaning of section 44C, it appears to follow that the latter interpretation is not a proper interpretation of the statute.

Accordingly, we conclude that, even if the groundwater used in operating the Solargy System was heated by sunshine when the water fell as rain, the statute is not intended to be read as including that heating as solar energy. It follows that regulations which do not include that heating as solar energy, and thus lead to the same result, are not "unreasonable and plainly inconsistent with the revenue statutes." *Commissioner v. South Texas Lumber Co.,* 333 U.S. 496, 501 (1948); *Bingler v. Johnson,* 394 U.S. 741, 749-751 (1969); *Fulman v. United States,* 434 U.S. at 533.

Under these circumstances, it is not for us to judge whether water-to-air heat pumps in general, or the Solargy System in particular, "deserve" to be treated as renewable energy source property because of their efficiency or because (as petitioners put it) "The Solargy System is also identical in function to the active solar system described in Treas. Reg. Sec. 1.44C-2(f)(2)." The statutory language is unclear. The legislative history is inconsistent with petitioners' claim for a credit. Insofar as the challenged regulation also excludes petitioners' Solargy System from the claimed credit, the regulation is valid.

In summary: (1) The statutory concept of "solar energy" is unclear and it is appropriate to elaborate the concept in Treasury Regulations; (2) the legislative history suggests that "solar energy" in section 44C is not intended to include the energy used by petitioners' Solargy System; (3) the regulations are not invalid insofar as they reach the same result as that to which the legislative history points.

We hold for respondent on this issue.[11]

## II. *Energy From Geothermal Deposits*

We consider next whether the Solargy System qualifies as property which transmits or uses energy derived from geothermal deposits.

---

[11]In light of our analysis of the statutory language and the legislative history, it is not necessary to determine whether subparagraph (1) of sec. 1.44C-2(f), Income Tax Regs., constitutes a "legislative" regulation.

a. *Statute*

Unlike the situation with regard to solar energy, the statute does define "geothermal deposit". However, the definition is not to be found in section 44C. Rather, section 44C(c)(5)(A)(i) defines "geothermal deposits" by ordering us to section 613(e)(3),[12] which provides that a geothermal deposit is "a geothermal reservoir consisting of natural heat which is stored in rocks or an aqueous liquid or vapor".

The language of the statute leaves us with uncertainty similar to that which we encountered regarding solar energy. In applying the statute in the instant case we must interpret the statutory term "heat". In a sense, anything which is warmer than absolute zero (about $-273°$ Centigrade) has heat, even though it is not hot. Did the Congress mean the statutory term "heat" in a sense that physicists might use, or does the term connote what might commonly be understood as "hot"?

Section 613(e)(3) was enacted in 1978, as part (sec. 403(a)(1), 92 Stat. 3203) of the Energy Tax Act of 1978, the same act that provided the residential energy tax credit under section 44C. The Secretary has not issued any regulations under section 613(e)(3), that might have provided guidance.[13] We look to the legislative history behind the statute for assistance.

On July 13, 1977, the House Ways and Means Committee reported out H.R. 6831 (Title II). In H. Rept. 95-496, part III, pp. 129-132 (H. Rept. 95-543, Vol. II, pp. 245-248), 1978-3 C.B. (Vol. 2) 71, 191-194, the Ways and Means

---

[12]SEC. 613. PERCENTAGE DEPLETION.

(e) PERCENTAGE DEPLETION FOR GEOTHERMAL DEPOSITS.—

* * * * * * *

(3) GEOTHERMAL DEPOSIT DEFINED.—For purposes of paragraph (1), the term "geothermal deposit" means a geothermal reservoir consisting of natural heat which is stored in rocks or in an aqueous liquid or vapor (whether or not under pressure). Such a deposit shall in no case be treated as a gas well for purposes of this section or section 613A, and this section shall not apply to a geothermal deposit which is located outside the United States or its possessions.

[13]Regulations proposed under sec. 613A (sec. 1.613A-7(e)) provide as follows:

Sec. 1.613A-7 Definitions.

For purposes of section 613A and the regulations thereunder—

(e) *Geothermal deposit.* The term "geothermal deposit" means a geothermal reservoir consisting of heat, largely stored in rocks, and, to a lesser extent, in aqueous fluid in the form of liquid or vapor.

This regulation, proposed on May 13, 1977, 42 Fed. Reg. 24264, has not been adopted.

Committee describes its provision (in sec. 2073 of the bill) of a 10-percent percentage depletion allowance for all geothermal resources regardless of whether the geothermal resource would qualify for depletion under the law at that time, and regardless of whether the resource in fact is renewable. The Ways and Means Committee's bill also provides (in section 2072 of the bill) a deduction for intangible drilling and development costs related to the exploration for, and the development of, geothermal deposits. Under the heading "Reasons for Change", the report states as follows:

> To encourage the exploration for, and the drilling and development of, geothermal wells and to accord geothermal resources uniform tax treatment, the committee decided to provide for all geothermal resources incentives similar to those provided for in the case of oil and gas.

The House bill's definition of "geothermal deposit" (in proposed section 613(e)(2)) is the same as the first sentence of what was enacted as section 613(e)(3).

On October 21, 1977, the Senate Finance Committee reported H.R. 5263. In S. Rept. 95-529, pp. 89-93, 1978-3 C.B. (Vol. 2) 199, 281-285, the Finance Committee explains that the bill provides a percentage depletion allowance for geothermal deposits, as well as a deduction for intangible drilling and development costs related to the exploration for, and development of, such deposits. The report, in describing the percentage depletion allowance, states as follows:

> The committee bill provides an allowance for percentage depletion for all geothermal deposits regardless of whether or not the geothermal resource would qualify for depletion under present law and regardless of whether or not the resource in fact is renewable, so long as the deposit is located within the U.S. or its possessions. The percentage is 22 percent for production in the years 1978 through 1980, 20 percent for the year 1981, 18 percent for the year 1982, 16 percent for the year 1983, and 15 percent for the years 1984 and thereafter. For purposes of these rules, a geothermal deposit means a geothermal reservoir of natural heat which is stored in rocks or in an aqueous liquid or vapor (whether or not under pressure). * * *

> * * * in order to encourage this relatively undeveloped resource, the committee bill exempts geothermal deposits from the limitations and the restrictions in section 613A. Therefore, percentage depletion for

geothermal deposits is available to all producers, including major producers who are not eligible for percentage depletion with respect to their oil and gas production. Also, percentage depletion is allowable for all of the taxpayer's geothermal deposits. (It is not limited to a certain number of barrels per day, or the Btu equivalent in the form of geothermal energy.) Further, the 65 percent of taxable income limitation, imposed on percentage depletion in the case of oil and natural gas, does not apply to percentage depletion for geothermal deposits. However, the usual rules (under sec. 613) for determining the taxpayer's gross income from the property are to apply, including those for allocating the income among resources where different resources are recovered.

Under "Reasons for Change", the report states as follows:

To encourage the exploration for, and the drilling and development of geothermal wells and to accord geothermal resources uniform tax treatment, the Committee decided to provide for all geothermal resources incentives similar to those provided for oil and gas.

The Finance Committee's bill (in sec. 1042(b)(2) of the bill) provides a definition of "geothermal deposit" which was adopted unchanged by the Senate and is essentially the same as what was enacted.

On October 12, 1978, the Conference Committee reported H.R. 5263 as the Energy Tax Act of 1978, and submitted a Conference report. H. Rept. 95-1773 and S. Rept. 95-1324, 1978-3 C.B. (Vol. 2) 309. The conference agreement followed the Senate version of the bill as to depletion for geothermal deposits, applicable to taxable years ending on or after October 1, 1978. H. Rept. 95-1773, S. Rept. 95-1324, p. 71, 1978-3 C.B. (Vol. 2) 343.

Both the Ways and Means Committee report and the Finance Committee report discuss *Reich v. Commissioner,* 454 F.2d 1157 (9th Cir. 1972), affg. 52 T.C. 700 (1969), which held that the production of geothermal steam entitled the taxpayers to both the percentage depletion allowance under section 613 (to the extent that the allowance was available for gas wells), and the intangible drilling cost deduction under section 263(c), as those provisions were in effect for 1959 through 1964. The Tax Court held that the taxpayers were entitled to the percentage depletion allowance for their product because (1) their product was steam, not inexhaustible earth heat, (2) the particular geothermal wells in question were exhaustible, (3) steam is a gas, and (4) the exclusion from the right to depletion of "water" in

section 613(b)(7) does not exclude steam from the depletion allowance. The Court of Appeals for the Ninth Circuit "affirmed on the basis of the Tax Court's opinion: *Reich v. Commissioner,* 52 T.C. 700 (1969)."

Both committee reports explain that although the Tax Reduction Act of 1975 had generally eliminated the depletion allowance for oil and gas, it had not affected the depletion allowance for geothermal resources. Thus, although the Internal Revenue Service had not acquiesced in the outcome of *Reich* in cases arising outside the Ninth Circuit, other courts might agree with the Ninth Circuit and decide that the percentage depletion allowance was available for similar geothermal gas wells. S. Rept. 95-529, p. 89, 1978-3 C.B. (Vol. 2) 281; H. Rept. 95-496, part III, p. 129 (H. Rept. 95-543, Vol. II, p. 245), 1978-3 C.B. (Vol. 2) 191.

Clearly, the Congress wanted to provide an incentive for the infant geothermal energy industry. The question comes down to whether the Congress, in enacting section 613(e)(3), intended to limit the depletion allowance to geothermal deposits above a certain temperature.

The geothermal deposit that was dealt with in *Reich* was steam. Steam ordinarily is about 100° Centigrade (212 °F). The Tax Court found that, in many of the wells in the field that were being developed, the steam was "superheated", and that "This indicates * * * that the reservoir contains * * * no significant quantities of liquid." 52 T.C. at 706. The Court went on to find (52 T.C. at 707) that—

The application of a general heat, material, and volumetric balance formula indicates there can be neither significant water present in the steam reservoir, nor liquid recharge, and that the reservoir is essentially a closed volume of steam. It is a volumetric reservoir. The presence of water in a few of the wells does not affect this determination and is due to condensation, leakage from the surface, and injection during drilling. * * *

In a communication to the Senate Finance Subcommittee on Energy and Foundations, Paul W. Eggers, President of Geothermal Kinetics, Inc., stated as follows:

it should be remembered that geothermal resources are available not only in the form of super heated steam but also in the form of hot water with lower temperatures. A temperature of 350 is hot enough to be used for the production of electricity, but as the temperature decreases, the costs

rise. Enactment of similar incentives to those provided for coal will make it possible to produce electricity from marginal and intermediate geothermal areas which otherwise will remain undeveloped for decades. Only areas like the Geysers where super heated steam is available close to the surface, will be developed in the absence of tax incentives.

* * * All that is needed to make geothermal energy an immediate, readily available, partial answer to our increasing energy crisis is clarification of the tax laws to accord with the decision of the Court of Appeals for the 9th Circuit in *Reich et al. v. Commissioner of Internal Revenue*, 454 F2d 1157 (9 Cir. 1972), affirming 52 T.C. 700 (1969). In that case the Court held that geothermal steam is a depletable resource and entitled to intangible drilling costs and depletion. Unfortunately, the Commissioner of Internal Revenue has not accepted the holding of that Court.

[Hearings on Incentives for Developing New Energy Sources, before the Subcommittee on Energy and Foundations of the Committee on Finance, United States Senate, 95th Cong., 1st Sess., at 234-235 (1977); Hearings on Title II of H.R. 8444, The Energy Tax Act of 1977, before the Committee on Finance, United States Senate, 95th Cong., 1st Sess., pt. 5 at 1680-1681 (1977).]

Robert Rex, President of Republic Geothermal, Inc., testified that geothermal resources in the United States provide a large recoverable energy base. The problem, he pointed out, is that the geothermal resource—

is a very diffused, low-grade resource. It first was developed in the higher energy density as dry steam. The next resource about to be developed in this country is hot water. The third, and a ramification of hot water research, which is hot, dry rock * * * which is a national resource, for every State from Texas to Maine and from Washington and Alaska, throughout the midcontinent to Wisconsin, are certainly major States with this type of potential.

What is happening in practice as we look at the economics and look at the marketplace, and our company has practical experience in understanding what it takes to get projects financed, is that we find that hot water resource is developed at the marginal threshold of economic potential.

[Hearings on Title II of H.R. 8444, The Energy Tax Act of 1977, before the Committee on Finance, United States Senate, 95th Cong., 1st Sess., pt. 3, at 1015 (Sept. 12, 1977).]

There ensued the following colloquy at the Finance Committee hearing (*id.* at 1020):

Senator Dole. I guess what you are suggesting, you would be on a par with any incentives for the nuclear field?

Mr. Rex. That is correct.

Senator Dole. Are we talking about an inexhaustible supply of geothermal?

Mr. Rex. It is just the opposite. In any particular reservoir, you are talking about a very short life for that portion of the reservoir.

For example, we are looking at hot water resources in the Imperial Valley. Let me take a specific case, the East Mesa field, a Federal lease. The average reservoir life of a given reservoir zone that is being developed is 12 years, then it will be exhausted for its heat content, and even that will take recycling of water.

So you have to develop multiple reservoir zones, maintain a series of wells to be drilled over the life of the powerplant.

So we are talking about a very rapid exhaustion.

The reason it is viable is the resource is large, so you leave undeveloped locations to drill later and develop later.

Senator Dole. If it is short term, is it worth the cost?

Mr. Rex. The answer is a marginal competitive energy resource. The point is, it can be substituted for imported oil at a price that is less than the cost of imported oil.

In other words, we are talking about competing in the $8 to $9 to $10 a barrel cost range for the hot water resource. We are talking about powerplants whose cost is half the cost of a nuclear powerplant.

The Staff of the Joint Committee on Taxation prepared a pamphlet for the use of the Senate Finance Committee, entitled Miscellaneous Provisions of H.R. 8444; Energy Incentives and Oil Imports, JCS 54-77 (Sept. 23, 1977) (hereinafter sometimes referred to as the Jt. Comm. Staff Pamphlet No. 6). In a section describing geothermal deposits, the pamphlet states as follows (pp. 4-6):

Geothermal energy is the natural heat contained in the crust of the earth. Although present everywhere throughout the crust, only in a few areas is it sufficiently concentrated and near to the surface to make its recovery presently economically viable.

### Types of geothermal energy

The various classes of geothermal resources in the order of their relative ease of recovery and economic utilization are:

*Vapor-dominated.*—Vapor-dominated geothermal resources contain saturated or superheated steam. To date, only six major vapor-dominated reservoirs have been located in the world. In the United States, the only commercially producing geothermal field is located at the Geysers, California, a dry steam field about 80 miles north of San Francisco. It has a production capacity of over 500 megawatts (MW). * * *

*Liquid-dominated.*—Liquid-dominated geothermal resources have naturally occurring liquid water, or a naturally occurring two-phase mixture

of liquid water and steam, at an elevated temperature and pressure. * * *

The high-temperature hydrothermal convection systems (that is, systems of liquid above 150° C., which circulate because of variations in their density and the action of gravity) with a potential for generating electricity are predominantly in the Western United States, including Alaska and Hawaii. * * *

The intermediate-temperature hydrothermal convection systems (90° C.) are potential providers of direct thermal energy for home and industrial heating, thereby releasing oil and gas for other uses. If this heat were to be supplied by electrical energy, the [U.S. Geological] Survey estimates that the equivalent of about 90,750 megawatts would be available annually for 30 years.

*Geopressured.*—Geopressured geothermal resources are extensive, deep (1 to 4 miles) zones of pressurized water with widely varying salinity in which the pressure exceeds the corresponding pressure of the water at that depth. This overpressure is caused by the weight of the geological formation (overlying the trapped fluid), which is greater than the weight of an equal volume of fluids. Geopressured systems contain water at temperatures measured at approximately 60° to 180° C. and pressures from about 3,000 to 14,000 psi together with potentially exploitable dissolved methane. Areas for potential development are located in the Gulf Coast states.

* * * * * * *

*Hot dry rock.*—Hot dry rock geological formations are those having an abnormally high heat content, but not containing sufficient water or sufficient rock permeability to permit withdrawal of hot water as a heat transport medium.

*Magma.*—Magma formations comprise molten rocks at approximately 500° to 1500° C. Very deep drilling, 20 miles or more, will be required to reach magma in most regions of the United States. Magma is reachable at drillable depths in some active volcanic areas, such as in Hawaii.

In discussing areas for Finance Committee consideration, the pamphlet states as follows (p. 11):

3. *Residential systems.*—The Committee also may want to allow a tax credit, similar to the credits contained in the House-passed bill for the installation of insulation and solar equipment, for the installation of a residential geothermal steam distribution system. Such a credit is contained in the House-passed bill for business installation of geothermal steam distribution systems.

Thus, as evidenced by the hearings record and the Joint Committee Staff Pamphlet No. 6, when the Finance Committee's attention was drawn to geothermal energy in the context of what became section 613(e), it was generally with regard to steam, hot water, or hot rock. The coolest hot

water described in any of these materials is at 60°
Centigrade (140 °F). The proposed uses generally were (1)
use of steam pressure to move turbines to generate electric-
ity, (2) use of heat to boil a liquid to generate steam, and so
on, to produce electricity, and (3) use of hot fluids directly
to heat buildings. Heat pumps do not appear to have been
discussed as a method of using heat from geothermal
deposits.

The statutory language directing us to section 613(e)(3),
and the legislative history of section 613(e)(3), provide
support for the provision in section 1.44C-2(h), Income Tax
Regs. (see note 14, *infra*), imposing a minimum temperature
requirement of 50° Centigrade for geothermal deposits.

b. *Legislative History*

We turn to an examination of the legislative history that
underpins section 44C. The House bill does not provide for
a residential energy tax credit for geothermal property.

As we have noted in our description of the legislative
history of the solar energy provisions, the Senate Finance
Committee added "geothermal deposits (as defined in sec-
tion 613(e)) ,which provide geothermal energy" to the
categories of energy sources which may be used by "renew-
able energy source property". The bill as passed by the
Senate was identical to the relevant part of the bill as
reported by the Finance Committee.

The Senate Finance Committee report (S. Rept. 95-529,
pp. 39, 40, 1978-3 C.B. (Vol. 2) 199, 231-232) states as
follows:

> The credit for geothermal energy property applies to geothermal
> equipment (and parts solely related to the functioning of such equipment)
> which uses geothermal energy to heat or cool a building or to provide hot
> water for it. The geothermal equipment must be equipment which is
> necessary to distribute or use geothermal steam and associated
> geothermal resources (as defined in sec. 2(c) of the Geothermal Steam Act
> of 1970—30 U.S.C. 1001(c)). Generally, geothermal energy is derived from
> geothermal deposits from geothermal reservoirs consisting of natural heat
> stored in rocks or in an aqueous liquid or vapor (whether or not under
> pressure). This includes hot brine, dry heat (that may be produced with
> the use of such a substance as freon) and hot water (such as that which
> may be used directly to heat a building equipped with a heating unit
> employing hot water heating). [Fn. ref. omitted.]

The Finance Committee report does not explain why it departs from the reported statutory language, "geothermal deposits (as defined in section 613(e))", by directing the reader to "sec. 2(c) of the Geothermal Steam Act of 1970—30 U.S.C. 1001(c)".

Thus, the Finance Committee report language appears to be inconsistent with the statutory language that the report was explaining.

However, as we read the Finance Committee report, it does not help petitioners. The language of that report also suggests that the Finance Committee contemplated that geothermal deposits would be "hot", and thus water at 13° Centigrade (about 56 °F) would not qualify.

The Conference Committee follows the Senate amendment on this point. H. Rept. 95-1773, S. Rept. 95-1324, p. 44, 1978-3 C.B. (Vol. 2) 316. Although the Conference Committee's statutory language is somewhat different from the Senate amendment, the Conference Committee (and the statute) kept the language defining geothermal deposits by reference to section 613(e).

### c. *Regulations—Validity*

Section 1.44C-2(h), Income Tax Regs.,[14] expands on the definition of "geothermal deposits" as provided in section 613(e)(3) by further requiring that the heat be from an

---

[14]Sec. 1.44C-2. Definitions.—* * *

(h) *Geothermal energy property.* The term "geothermal energy property" means equipment (and parts solely related to the functioning of such equipment) necessary to transmit or use energy from a geothermal deposit to heat or cool a dwelling or provide hot water for use within the dwelling. With respect to expenditures made after December 31, 1979, the term "geothermal energy property" also means equipment (and parts solely related to the functioning of such equipment) necessary to transmit or use energy from a geothermal deposit to produce electricity for use within the dwelling. Equipment such as a pipe that serves both a geothermal function (by transmitting hot geothermal water within a dwelling) and a non-geothermal function (by transmitting hot water from a water heater within a dwelling) does not qualify as geothermal property. A geothermal deposit is a geothermal reservoir consisting of natural heat which is from an underground source and is stored in rocks or in an aqueous liquid or vapor (whether or not under pressure), having a temperature exceeding 50 degrees Celsius as measured at the wellhead or, in the case of a natural hot spring (where no well is drilled), at the intake to the distribution system.

[This text embodies amendments by T.D. 8146, 52 Fed. Reg. 26667, 1987-2 C.B. 7, 12, promulgated June 11, 1987, but applicable to expenditures made after December 31, 1979. 1987-2 C.B. at 8. The 1987 amendments are (in the first sentence) the substitution of the word "means" for the word "includes" and the addition of a second sentence to include expenditures made after December 31, 1979. For taxable years beginning after December 31, 1983, the regulation is redesignated section 1.23-2(h), 1987-2 C.B. 7-8.]

underground source, and that it have a temperature exceeding 50° Celsius (Centigrade) as measured at the wellhead.

The Court's role in a case of this sort, even assuming that the regulation is interpretative and issued under the authority of section 7805(a), "begins and ends with assuring that the Commissioner's regulations fall within his authority to implement the congressional mandate in some reasonable manner." *United States v. Correll,* 389 U.S. 299, 307 (1967). If we find that the regulation furthers the intent of the Congress, consistent with the statute, then we uphold the regulation.

The Congress failed to provide clear or specific guidance on what was meant by the term "heat", in the statutory definition of "geothermal deposit". After examining the legislative history, we believe that the Congress intended to include within the meaning of geothermal deposit only those substances that are generally perceived of as hot, and that the Congress meant to exclude substances that are lukewarm or at room temperature. Thus, the groundwater used by petitioners in operating the Solargy System does not come within the definition of "geothermal deposit" as intended by the Congress. We conclude that the Treasury Department's decision to restrict the credit to groundwater which is considerably hotter than 13° Centigrade, in light of the meager guidance provided by the Congress, was not unreasonable. It follows that petitioners' Solargy System does not qualify for the residential energy credit as geothermal energy property.

We hold for respondent on this issue.[15]

---

It appears that the Solargy System provides, at least in theory, energy saving through the use of renewable energy

---

[15]In *Peach v. Commissioner,* 84 T.C. 1312 (1985), affd. 805 F.2d 393 (4th Cir. 1986), this Court held that the 50° Centigrade requirement of sec. 1.44C-2(h), Income Tax Regs., was a reasonable interpretation of the statute. In so holding we stated that this "regulation was promulgated pursuant to a specific statutory authority. Such regulations are legislative in nature and should be sustained unless clearly inconsistent with the statute they implement." 84 T.C. at 1317.

Petitioners have challenged *Peach,* averring that section 1.44C-2(h), Income Tax Regs., is interpretative rather than legislative. Because we conclude that the regulation's disallowance of the credit in the instant case is supported by the legislative history (although it might be argued that this definitional regulation belongs in section 1.613, rather than 1.44C), we do not consider whether the regulation is legislative or interpretative.

sources, and thus serves the purposes that the Congress had in enacting Pub. L. 95-618, the Energy Tax Act of 1978. However, the Congress provided only the two pigeonholes of solar energy or geothermal deposits, and the Solargy System fails to fit into either pigeonhole. Perhaps the Congress should have added more categories, but it did not. The Congress authorized the Secretary of the Treasury to add more categories ("or any other form of renewable energy which the Secretary specifies by regulations"— section 44C(c)(5)(A)(i)). Perhaps the Secretary of the Treasury should have exercised his authority, but he did not.

Thus, present law does not authorize us to grant the claimed credit to petitioners.

*Decision will be entered for the respondent.*